(No. 13518.—Judgment affirmed.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, vs. WALTER STEPHENS, Plaintiff in Error.

*Opinion filed February 15, 1921—Rehearing denied April 8, 1921.*

1. CRIMINAL LAW—*when record of former acquittal is not admissible.* Where a defendant is charged with assault with intent to murder a police officer, an acquittal of the defendant upon the charge of murdering another police officer at the time of the alleged assault is no bar to a prosecution for the assault, and the record of the former trial for murder is not admissible to show that the defendant was not guilty of the assault.

2. SAME—*when assault upon police officer is an assault with intent to murder.* The fact that police officers who have arrested a man on suspicion of his being an automobile thief have no warrant for his arrest does not reduce his deliberate killing of one of the officers from murder to manslaughter, nor preclude his being indicted upon the charge of assault with intent to murder the other police officer, who was wounded in the encounter but recovered. (*Rafferty* v. *People*, 69 Ill. 111, distinguished.)

3. SAME—*jury may be instructed to apply to the facts the law as given in the instructions.* In a criminal case it is proper to instruct the jury that they should apply to the facts the law as given in the instructions, and if the defendant desires that the jury be instructed that they are the judges of the law he should submit such an instruction.

4. SAME—*improper remarks in argument must be objected to and a ruling obtained for assignment of error.* A defendant who wishes to assign as error improper remarks by the State's attorney in his argument to the jury should object to the argument at the time it is made and obtain a ruling or a refusal to rule thereon by the court.

5. SAME—*when judgment will not be reversed for misconduct of jurymen.* A judgment of conviction will not be reversed for the misconduct of two jurymen who communicated with the widow of the victim of the assault for which the defendant is being tried, where, after full investigation upon the motion for new trial, there is no showing that any remarks prejudicial to a fair trial were made by or to the jurymen during said conversation. (*People* v. *Strause*, 290 Ill. 259, followed.)

6. SAME—*Supreme Court will not determine weight of conflicting evidence on defense of alibi.* Where the evidence to sustain or disprove the defense of alibi is conflicting, it is for the jury to

decide whether or not the defendant was at the scene of the crime at the time it was committed, and a judgment of conviction will not be reversed on the facts unless the evidence clearly indicates a reasonable doubt of guilt.

CARTWRIGHT, C. J., and FARMER and STONE, JJ., dissenting.

WRIT OF ERROR to the Circuit Court of Kane county; the Hon. MAZZINI SLUSSER, Judge, presiding.

NASH & AHERN, JOHN K. NEWHALL, CHARLES E. WOODWARD, and CHARLES P. R. MACAULAY, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, CHARLES L. ABBOTT, State's Attorney, R. R. PHILLIPS, and J. BRUCE AMELL, (MIGHELL, GUNSUL & ALLEN, of counsel,) for the People.

Mr. JUSTICE CARTER delivered the opinion of the court:

Plaintiff in error, Walter Stephens, was tried and convicted in the circuit court of Kane county on an indictment charging that he and William VonGundy assaulted Lester Wedemeier by shooting with a revolver, with intent to murder him. VonGundy was not tried and seems not to have been apprehended. Motions for new trial and in arrest of judgment were made and overruled, and the case has been brought here by writ of error.

The record shows substantially as follows as to the alleged crime: Shortly after midnight on October 29, 1918, Daniel M. Drake, a police officer of Aurora, went into the Broadway Cafe to have some lunch. He testified that shortly thereafter two men entered, one wearing a dark velour hat and a light overcoat and the other wearing dark clothes and overcoat; that one of the men, whom officer Drake identified on the trial as Stephens, went into the toilet, where he heard him vomiting, and later Stephens came back and sat down with his associate and ordered lunch.

The officer finished his meal shortly thereafter and left the restaurant and took down the license number (99224) upon a five-passenger Buick automobile standing outside, which, on investigation over the 'phone with police headquarters, he found was issued for a Ford automobile in Chicago to William VonGundy, of that city. This Buick car appears to have been the one in which Stephens and his associate drove up before the restaurant. Drake further testified that being himself at the time on crutches on account of a previous injury, he summoned, among others, police officers Olin and Wedemeier. While these officers were examining the automobile, Stephens and his associate, who was afterwards recognized by pictures by some of the witnesses on the trial as VonGundy, emerged from the restaurant. There is testimony of Harry Paulos, who had been in the restaurant at the time Stephens, VonGundy and the officer were there, that after the officer left there was a dispute between Stephens and the waiter over the amount of sugar furnished and that Stephens used violent language, the remarks being what Paulos called unendurable and immodest. When Stephens and his companion left the restaurant officer Olin asked them where they were from and where they were going, and Stephens replied that they were from Dundee and on their way to Chicago. Olin told them to get into the automobile and drive to the police station, and Stephens asked if that was on account of the dispute over the sugar, and Olin replied, "Yes; and we want to look you over." It appears from the testimony that the two men got into the front seat of the automobile, VonGundy driving and Stephens on the right, while the two officers, Olin and Wedemeier, occupied the rear seat, Olin on the left side; that thereupon, without any further discussion, the car was turned about and was driven westward over the bridge crossing Fox river toward the police station in the city hall a short distance, and when the car reached the city hall Stephens quickly turned in his seat in front, say-

ing, "Turn here?" and immediately fired two shots from a revolver at officer Olin, who exclaimed, "They got me!" that officer Wedemeier then jumped up and grabbed the revolver in Stephens' hand and as he did so was shot by Stephens through the shoulder and also shot in the side, which compelled him to let loose of the revolver; that he was then pushed from the automobile by Stephens and his companion, the fall breaking the revolver in his hip pocket and making it impossible to use it; that while crawling on the pavement he was shot at again by Stephens, and again as he raised himself to his feet by the aid of a pillar at the east end of the bridge, at which place he tried to make the revolver work.

The testimony shows that the occupants of the automobile pushed the wounded officer, Olin, from the car and drove rapidly westward; that shortly thereafter a dark velour hat was picked up in the street where they passed which resembled the one worn by Stephens. The testimony shows that officer Olin died the next afternoon, but Wedemeier, though seriously wounded, recovered and appeared as a witness on the trial. Not long after the shooting an automobile stopped for a few minutes near a farm about twelve miles west of Aurora and then drove on, and the next morning a cap was found in the field near where the machine stopped; that early in the morning of October 29 a Buick automobile was found damaged and abandoned in the road near the home of John Oleson, in Kendall county, there being in the car two Ohio license plates, the numbers corresponding with those on a circular post-card sent to police stations with reference to the automobile theretofore stolen in Ohio, and also some cartridges, a number of which had been used; that this automobile was turned over to the city police department and later to the insurance company as belonging to a man in Columbus, Ohio. The farmer, Oleson, testified that shortly after the finding of the automobile he discovered that some straw in his barn loft had

been arranged so as to make a bed or nest. The Fox and Illinois Union Electric railway runs near Oleson's farm on the line between Aurora and Morris, and Charles Clayton, a conductor in the employ of the company, testified that he had been warned to look out for strangers after the abandoned automobile was found, and on that morning he noticed two men board his car, both wet and muddy, about half a mile from Oleson's house, one wearing a hat and the other a cap; that he did not at once report the matter to the police because he thought he recognized the men as painters from Morris who had traveled on his car before. The record shows, and it is conceded by counsel, that Stephens was before this trial tried for the murder of Olin and acquitted, and that shortly before this first trial the conductor, Clayton, was shown a police circular containing pictures of Stephens and VonGundy and recognized them as the men who boarded his car.

Plaintiff in error's defense was, in effect, an alibi, that on July 23, 1918, he was shot in Chicago by a police officer named Russell, who, according to the plaintiff in error, jumped upon the running-board of the car and for some reason Stephens did not know shot him twice in the right leg; that the result of this shooting was a fracture of the bone; that his leg was kept in splints for some weeks and treated and in September was put in a plaster cast, which was not removed until November 8, 1918, when he was able for the first time to limp about with a cane; that after his injury he went first to his brother's house in Chicago and afterwards to his own home; that on November 13 he had an X-ray picture taken showing the fractured bone, which photograph was introduced in evidence as Exhibit A. Plaintiff in error denied positively all participation in the crime for which he was tried, and testified that on account of the injury to his leg he was unable to be out of his house until some time after this crime was committed. He also introduced in his behalf the testimony of several wit-

nesses to the effect that they saw him in bed at his home at different times during August, September, October and November, 1918, although most of them testified they were not able to say that they saw the leg itself, as it was wrapped up. Some of these witnesses occupied rented rooms in the home of the plaintiff in error and lived there during these months and saw him frequently, and testified that he was apparently disabled and helpless during these months in Chicago. One witness, Dr. Fred Fair, testified that he attended Stephens, and while he had no independent recollection of his visits except from his office memorandum book, such book showed that he visited plaintiff in error several times during September and October, and that he visited him on October 28, finding him in bed on the day of the shooting. Plaintiff in error testified that when he recovered he heard he was accused of the murder of Olin and went to Aurora on December 20, 1918, with witnesses; that with these witnesses he passed officer Wedemeier on the street, and that Stephens walked past him and said "Good evening" and was not recognized by the officer. Robert Mall testified in this case that he was with one of the attorneys for the defense in the former trial of Stephens for the murder of Olin at the time Stephens spoke to officer Wedemeier on the street in Aurora and that Stephens wore glasses at that time. Stephens testified that later on he again went with a witness and met officer Wedemeier and asked the latter where the Bishop Hotel was in Aurora; that in a moment they returned to the officer, saying they made a mistake and wanted the Aurora Hotel, and that Wedemeier directed them to the latter hotel without in any way recognizing Stephens. Apparently during the same trip Stephens went with other witnesses to the hospital in Aurora where officer Drake was confined on account of injuries, and Stephens testified that he and the witnesses went to the room which Drake was occupying and that Stephens walked up to the bed and spoke, apologizing

for intruding, pretending he made a mistake in looking for some other patient, after which they withdrew. The nurse who was attending Drake at this time testified that she remembered some men rapping at the door of the room occupied by Drake and that she met them, and one of the men asked if that was not Mr. O'Connor's room, and on being told it was not, the men left, none of them entering the room; that the man who spoke wore glasses. Stephens testified denying that he wore glasses on either of these occasions. Officer Russell, of Chicago, testified on this trial that he had shot plaintiff in error in July, as testified to by the latter. There is no direct evidence by him or anyone else as to why he shot him, but we infer from the record and briefs that he was attempting to arrest him on the charge of having had a part in another crime.

Counsel for plaintiff in error offered in evidence on the trial of this case the record of the indictment and verdict of acquittal in the former trial of People *vs.* Stephens for the murder of officer Olin. On objection this evidence was not admitted. It is argued by counsel for plaintiff in error that this refusal was error; that the acquittal of plaintiff in error of the murder of Olin barred his prosecution under this indictment, as the assaults on officers Olin and Wedemeier were made at one and the same time. The rule has been announced as to such a crime as this that "where one assaults or kills two persons by separate shots or strokes, although in the same riot or affray, an acquittal or a conviction of one assault or homicide is no bar to an indictment for the other, as they are distinct acts." (16 Corpus Juris, 283, 284.) This conclusion is borne out by the reasoning of this court in *Campbell* v. *People,* 109 Ill. 565, *Spears* v. *People,* 220 id. 72, and *People* v. *Fox,* 269 id. 300.

Counsel for plaintiff in error concede the authorities are not all in agreement with their argument upon this point, but insist that the better reasoning supports what they claim is the conclusion reached in *Moss* v. *State,* 16 Ala. App. 34,

that where the killing is pursuant to and a continuation of the assault and done under the impulse of the same design it is but one act, but the court also said in that case that "where a man kills two men in quick succession, with a formed design as to each, it is two offenses." This last conclusion in that case is in accord with the holding of the authorities in this State, and supports the ruling of the trial court that the record of the former trial and acquittal as to officer Olin's death did not bar the prosecution in this case.

Counsel for plaintiff in error also argue in this connection that the record of the former trial should have been admitted in order to show that if plaintiff in error was not guilty of killing Olin he could not be guilty under this indictment. We think this argument on this record is without force.

Counsel also argue that even if plaintiff in error was one of the two persons in the automobile who shot officers Olin and Wedemeier, as they had not been arrested under a warrant on a charge of crime, the killing of Olin would be, at the most, only manslaughter, under the reasoning of this court in *Rafferty* v. *People,* 69 Ill. 111, and *People* v. *Brown,* 288 id. 489, and that plaintiff in error could only have been guilty of manslaughter even if Wedemeier had died from the effect of the shooting; that a person cannot be convicted of assault with intent to commit manslaughter, for there is no such crime. (*Moore* v. *People,* 146 Ill. 600.) In *People* v. *Capello,* 282 Ill. 542, this court had under consideration a crime of a somewhat similar nature in which officer Hill was injured by the accused while on the wagon which the latter was driving, the court saying in that opinion (p. 548): "Hill was a trespasser on the wagon, but the circumstances would not permit of an inference that he was attempting an illegal arrest of the defendant, so that the rule of *Rafferty* v. *People,* 69 Ill. 111, does not apply. The defendant had received a shipment of ten cases of beer which he proposed taking to his own home for his

personal use, and it would be quite natural for a policeman charged with the enforcement of the law to conclude that the supply so exceeded the requirements of personal use as to justify an investigation. At any rate, there was no evidence tending in any degree to prove that when Hill got on the wagon he intended any personal violence to the defendant but only intended to examine the case of beer, and the defendant had no right to kill him to prevent a trespass." (Citing authorities.) Also in *People* v. *Johnson*, 286 Ill. 108, this court had under consideration the ruling in *Rafferty* v. *People, supra,* as to its bearing on the crime then under discussion, and said (p. 112) : "Whether plaintiff in error knew Corcoran was an officer or not, the proof for the State was sufficient, if the jury gave it credence, to show that the shooting was begun by plaintiff in error and was without any justification. The evidence for the State tends to show the plaintiff in error knew Corcoran was an officer; but whether he did or not, there was no justification whatever for plaintiff in error opening fire on Corcoran, if he did begin the shooting, as testified by a witness on the part of the State." These last two cases are more nearly like this case on the facts than are the facts in *Rafferty* v. *People, supra,* or *People* v. *Brown, supra.* The *Brown case* is not in point, because the evidence failed to show that the defendants knew in that case that they were being pursued by police officers, while on this record when officer Drake discovered that the license number on the Buick automobile belonged to a Ford car he was justified in believing it was a stolen car and in concluding that it was his duty to take those who apparently claimed to be the owners of the car to the station for examination. The plaintiff in error, when told to drive to the police station, had no right to assume or suppose that the officers were going to kill or maim him and his companion, and it is clear that he had no right to kill these officers to prevent being further examined at the police station. The evidence in

this record clearly showed that the shooting was actuated by malice and not by a sudden and uncontrollable impulse in the white heat of passion; that the shooting was done with a wicked mind and by one bent on mischief, and was a deliberate and cruel act which showed an abandoned and malignant heart. The two men without objection got into the car and started to drive to the police station, and then, without any further provocation, three or four minutes later Stephens deliberately shot both the officers, threw them out of the automobile to the pavement and afterwards deliberately shot at one of the wounded officers. It would be no justification of this crime that Stephens feared, as he testified in reference to the Heller-Rose robbery on this trial, that if he were put under arrest he would not have proper opportunity to prepare his defense on the robbery charge. The reasoning in *Rafferty* v. *People, supra,* is not controlling on this record. Rather the conclusion must be reached, as was reached in *People* v. *Capello, supra,* and *People* v. *Johnson, supra,* that plaintiff in error had no right to kill the officers to prevent his arrest, and that an indictment and conviction for an assault and attempt to commit murder upon officer Wedemeier was properly upheld on this trial.

It is also urged that the trial court committed error in permitting the cap that was found near the automobile, near Oleson's farm, to be introduced in evidence. At the time this cap was introduced the State made this announcement: "We also offer in evidence People's Exhibit 3, being the cap that was found in the automobile, identified as the cap that was worn by officer Olin." Counsel for plaintiff in error on the trial made the following objection: "The cap we object to; it is not material in this case." It is now objected that the cap was not identified as the one worn by officer Olin. At the time it was offered it was stated that it was identified as his cap, and the objection was then made, not that it was not identified but simply that it was not material. Had the objection been then made "not prop-

erly identified," doubtless the court would not have admitted it until after it was identified. In view of the only defense,—that of alibi, or, perhaps more properly, that he did not do the shooting,—offered for plaintiff in error, we do not see how the admission of this cap could have possibly injured him.

It is also objected that the trial court erred in giving instructions 12 and 29 for the People, which instructions stated, in effect, that it was the duty of the jury to apply to the facts the law as given to them in the other instructions, it being argued that these instructions in effect overruled the statute which states that the jury in criminal cases shall be judges of both the law and the facts. On the reasoning of this court in *People* v. *Mirabella,* 294 Ill. 246, the giving of these instructions cannot be urged as error, for it was said in that case (p. 250) : "If plaintiffs in error desired that the jurors be further instructed on their right to ignore the court's instructions they should have submitted such an instruction." ·

It is further argued that plaintiff in error was prejudiced by the remarks of the State's attorney in his opening address to the jury at the close of the evidence, in which he charged, among other things, that the plaintiff in error was at the time of the shooting a fugitive from justice. On objection being made to this, the trial court told the attorney for plaintiff in error that he would have an opportunity of addressing the jury thereafter and could give his own recollection and version of the testimony, adding: "It is for the jury finally to decide what was and what was not given in evidence. Lawyers have no right to go outside the evidence, but the court cannot say what was said by a witness and what was not said. The jury will have to decide." In view of plaintiff in error's testimony that he had given bond in the robbery case in Chicago and the argument of his counsel that if arrested before that trial he could not properly prepare his defense in the robbery

case, it was a fair argument to the jury, if he did the shooting charged in the indictment, that he was attempting to evade arrest at the time and was therefore a fugitive from justice. ·

It is also objected that the State's attorney in this same address made improper remarks, to the effect that plaintiff in error was at one time a slugger for newspapers in Chicago. Plaintiff in error testified that he had been at one time employed by the newspapers, and while, perhaps, it might be thought that some of the remarks of the State's attorney on this point were improper, there was no ruling by the trial court with reference to these remarks nor any refusal to rule on them on the insistence of counsel for the plaintiff in error. This court said in *People* v. *Weil,* 243 Ill. 208, on page 214: "A party cannot assign as error in this court improper remarks by the State's attorney in his remarks to the jury unless he objects to such remarks at the time they are made and preserves an exception to the ruling of the court upon such objections or upon the refusal of the court to rule thereon. [Citing authorities.] The statement by counsel for the defendant during the argument of the State's attorney, 'I except to the statement of the State's attorney,' or words to that effect, without any ruling of the court or an exception to the failure of the court to rule upon the objection, does not preserve for review in this court an exception to the remarks of the State's attorney."

It is further objected by counsel for plaintiff in error that he did not have a fair trial because of the actions of two of the jurors on the trial of the case. It appears from the record that the jurors, after they were sworn in, were not kept together but were allowed, without objection, to go at large during the trial, with oral instructions by the trial judge that they must not talk to anyone or allow anyone to talk to them about the case during the trial; that during the trial, at one of the adjournments, two of the

jurors, who lived in Dundee, Kane county, went to the depot of the electric railway in Geneva, the county seat, to take an electric car to Aurora, in the same county; that while they were there they saw Mrs. Olin, the wife of the deceased officer, Olin, and her sister, and also plaintiff in error and some of his counsel, and that plaintiff in error offered these two jurymen cigars, which they refused; that thereafter all these parties boarded an electric car for Aurora; that on leaving the car at Aurora the two jurymen, then being watched by the attorneys for plaintiff in error, followed a little way behind the two women and saw them talking to an Aurora police officer; that thereafter the jurymen approached and spoke to the women; that Mrs. Olin told them, during this conversation, who she was, and showed them, to confirm her statement that she was Mrs. Olin, a check or draft drawn in her favor. The jurymen stated that they then told her they did not want to talk to her in regard to the case; that later they tried to make a date with the women; that Mrs. Olin made an appointment with the jurymen to meet them at the Y. M. C. A. building that evening at eight o'clock, but that the sister said she had another engagement and could not come; that they then parted, and later in the evening the two jurymen went to the Y. M. C. A. building but did not meet Mrs. Olin. There was no evidence in any way tending to show that any remarks prejudicial to a fair trial in this case were made by any of the parties during the conversation between the jurymen and Mrs. Olin and her sister. It appears that Mrs. Olin and the sister had been in the court room during the trial, but the jurymen testified that they had never noticed them and did not know who they were until Mrs. Olin told them in Aurora. It goes without saying that this conversation by the jurymen with these two women was improper and should not have taken place, but under the reasoning of this court and in view of the authorities in this State cited in *People* v. *Strause,* 290 Ill. 259,

.we cannot say that reversible error was committed because of such conversation or that the plaintiff in error was in any way prejudiced thereby. The next day after this meeting took place between the jurymen and Mrs. Olin and her sister in Aurora the matter was called to the attention of the trial judge, and after a brief investigation the judge stated that he did not think he ought to stop the trial to investigate the matter but would hear it fully on a motion for new trial. A full investigation was made on the motion for new trial, all the jurymen being present and each being examined and testifying orally with reference to the transaction. .In view of what has already been said we do not think the trial judge erred in refusing to stop the trial to investigate the matter fully at the time the complaint was made to him.

The argument is earnestly made by counsel for plaintiff in error that the evidence of his alibi is of such a nature that a conviction in this case was not justified. There can be no question that there is serious conflict in the evidence as to plaintiff in error being guilty of the offense in question. If some of the alibi witnesses testified truly he was not there at the time of the commission of the crime, but several police officers and several disinterested persons testified positively that he was in Aurora at the time of the crime, and they identified him not only by his personal appearance but by a peculiar tone of his voice when they heard him talking in a room in the county jail at Geneva. On this state of the record it was peculiarly a question for the jury to decide whether or not plaintiff in error was at the scene of the crime at the time it was committed. (*People v. Maciejewski*, 294 Ill. 390, and cases there cited.) The law has committed to the jury the determination of questions of fact, and where the decision in a criminal case depends upon the credibility of witnesses, a judgment of conviction will not be reversed on the facts unless the evidence clearly indicates a reasonable doubt of guilt. (*Peo-

*ple* v. *Grove,* 284 Ill. 429.)   The testimony of plaintiff in error as to being confined to his room, and as to his attempts to show that officers Wedemeier and Drake did not identify him, was of such a nature as to cause the jury to examine his testimony with unusual care.   We think on this record the jury were justified in finding the plaintiff in error was the man who shot officer Wedemeier in the city of Aurora on the night in question.

   We find no reversible error in the record, and the judgment of the circuit court will therefore be affirmed.

*Judgment affirmed.*

CARTWRIGHT, C. J., FARMER and STONE, JJ., dissenting:

   An alibi was not the only defense made in this case. The crime charged in the indictment was committed by someone, and that fact was not questioned or controverted. The case against the defendant rested solely upon identification of him as the person who committed it.   He denied that he committed the crime or participated in any manner, and met the testimony by which the People sought to identify him as having committed it by evidence that he was at a hotel in Aurora for nine days in December and again for two days in January, and that he not only met the witnesses for the People but spoke to them and was not recognized.   He and a man who was with him testified that when he was in Aurora they met Wedemeier and the defendant asked him where the Bishop Hotel was and was directed to it, and afterward they met Wedemeier again and the defendant asked him to direct him to the Aurora Hotel, and Wedemeier gave the direction and did not recognize the defendant.   The defendant and the chief clerk of the criminal court of Cook county and the same witness before mentioned testified that they went to the hospital and saw Drake, and the defendant spoke to him and was not recognized by Drake.   The only reason given by the prosecution for the failure of Wedemeier or Drake to

recognize the defendant was that he wore glasses on the occasions when they saw him. But the evidence of identification did not rest on appearance, alone. The witnesses testified that they recognized him at the time of the commission of the crime, and afterward, by the peculiar tone of his voice, and if wearing glasses was any excuse for not recognizing him when they saw him afterward in Aurora, the glasses had no effect on his voice when he spoke to Wedemeier and Drake.

There was also evidence of the alibi, and although that defense is commonly discredited, and perhaps justly so on account of the sources from which it frequently comes, it is a perfect defense if established and entitled to the same consideration as any other defense. There was no dispute of the fact, or anything tending to discredit the testimony, that the defendant was shot twice in the leg below the knee in Chicago by a police officer on July 23, 1918, causing a fracture of the bone of the leg, and the evidence covering the entire period from that time until November 13, after the crime was committed, came from unquestioned sources. The testimony was given by the credit manager for the Twelfth Street Store, in Chicago, the president of the Horse Shoers' Union, a salesman for the Howe Scale Company, an employee of the W. E. Roe Paper Company, and a widow, all of whom were well acquainted with the defendant and were above suspicion. The defendant was first treated for his injury by a doctor who went to the army, and was afterward treated by another doctor from September 29 to December 1, continuously, as shown by book entries of frequent visits covering the entire period. The doctor testified that he took the plaster cast off from the leg on November 8, and on November 13, when the defendant was upon crutches, an X-ray picture was taken which plainly shows a fracture of the shin-bone. Whatever justification there may have been for discrediting testimony offered by the defendant concerning the failure to recog-

nize him when he was in Aurora after the commission of
the crime, there was none as to the evidence of the alibi,
and to say that upon such proof the jury could disregard
the evidence would be to eliminate that defense entirely
from the law.

The statement of the defendant that he did not go to
Aurora and surrender himself without being arrested and
go to jail was not made as any justification for shooting
Wedemeier. He was under no obligation to go to Aurora
and surrender himself, and his failure to do it did not tend
to prove guilt.

The statements of the State's attorney in his argument
to the jury were of such a character as to preclude any
fair consideration by the jury of the evidence in the case,
and the fact that the defendant's attorneys did not insist
upon a ruling as to each statement is no ground for dis-
regarding the objections made, because of a ruling of the
court that he would not entertain objections. The first ob-
jectionable statement was that at the time of the commis-
sion of the crime the defendant was a fugitive from jus-
tice on account of the Heller-Rose crime. There was no
evidence justifying such a statement, and if there had been
it was grossly improper. On objection being made the court
replied: "You will have a chance to address the jury and
you can give your own recollection and version of the tes-
timony. It is for the jury finally to decide what was and
what was not given in evidence. Lawyers have no right
to go outside the evidence, but the court cannot say what
was said by a witness or what was not said. The jury
will have to decide." By this ruling the court refused to
interfere with anything the State's attorney might say and
in substance ruled that he might say anything he pleased.
The State's attorney then continued his address and in the
course of it said that when the police officer shot the de-
fendant on July 23 he was attempting to arrest him; that
he must have wanted to arrest him for something, and the

jury had a right to believe that he was attempting to arrest him for the Heller-Rose crime; that at one time the defendant was in the newspaper business and the newspapers had wars between themselves when they employed sluggers, and while he was not saying that the defendant was one of the sluggers, the jury had a right, as sensible men, to have an opinion as to the kind of a man the defendant was; that he came from Chicago,—the home of desperate characters,—where people were held up for robbery and where people are murdered every day; that birds of a feather flock together, and the jury had every reason to believe from the evidence in the case that the defendant was a man of that kind of character. The policeman who shot the defendant in Chicago was a witness for the People and did not say or intimate that he was attempting to arrest the defendant, nor was there any other evidence tending to prove an attempted arrest. When each one of these statements was made the attorneys for the defendant objected, and the court having already ruled that the State's attorney might say whatever he liked and the court would not restrain him, no further ruling was required. When the court had abdicated the function of regulating the course of the argument and preventing unfair and improper assertions of the State's attorney it would have been improper for attorneys for the defendant to insist upon repeated rulings as to each statement. It need not be said that the privilege of replying to such statements would afford the defendant no remedy for the prejudice created by them.

The conduct of the jurors was also such that the court ought to have allowed the motion for a new trial.