THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* GEORGE MINDEMAN, Plaintiff in Error.

*Opinion filed June 18, 1925—Rehearing denied October 9, 1925.*

1. CRIMINAL LAW—*when conviction will not be reversed on evidence.*   Where there is conflict in the testimony it is the function of the jury to determine the truth of the controversy, and a reviewing court will not substitute its judgment for that of the jury and reverse a judgment of conviction unless there is a reasonable doubt of the defendant's guilt or it is clear that the jury have made a mistake or that the verdict is the result of passion and prejudice.

2. SAME—*when improper argument will not reverse.*   Improper remarks of the State's attorney during his argument will not require a reversal where the remarks are not of such a character as would probably influence the jury and where the court sustains objections to the improper remarks and instructs the jury not to consider them.

3. SAME—*motions for a new trial because of newly discovered evidence are not favored.*   Applications for a new trial on the ground of newly discovered evidence are not regarded with favor by the court and will be closely scrutinized.

4. SAME—*newly discovered evidence must be conclusive to warrant new trial.*   To justify a new trial on the ground of newly

discovered evidence the new evidence must be conclusive and not merely cumulative, and it must have been discovered since the trial and be such as could not by the exercise of due diligence have been discovered before.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. WILLIAM J. LINDSAY, Judge, presiding.

LOEWENSTEIN & RABINOFF, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, ROBERT E. CROWE, State's Attorney, and JAMES B. SEARCY, (EDWARD E. WILSON, and CLARENCE E. NELSON, of counsel,) for the People.

Mr. JUSTICE FARMER delivered the opinion of the court:

George Mindeman has sued out this writ of error to review a judgment of the criminal court of Cook county sentencing him to the penitentiary for the crime of larceny. The abstract contains a brief statement that the indictment charged defendant with larceny as bailee in one count, with embezzlement in another and larceny in another. The jury found him guilty of larceny in manner and form as charged in the indictment.

Defendant contends the judgment should be reversed because, first, it is not sustained by the evidence; second, the court erred in the admission and exclusion of evidence; third, the jury were influenced by improper remarks of the State's attorney, which prevented defendant receiving a fair trial; fourth, the court erred in not granting a new trial on the ground of newly discovered evidence.

The abstract is imperfect and the briefs on neither side are as helpful as they should be. We have been compelled to refer to the record for some testimony.

The money that defendant was charged with embezzling and stealing was the money of Adolph Hammer, a sculptor, who came to this country from Germany and has resided in Chicago since the summer of 1913. Soon after he came

to Chicago he made the acquaintance of George Minde-
man, the defendant, and their acquaintanceship continued
throughout until the arrest of defendant. In 1921 Ham-
mer contracted with Hield & Co., a real estate firm, for
the purchase of a lot for $1650. He paid $120 cash at
the time the contract was made and agreed to pay monthly
installments of $10 until the lot was paid for. Hammer
made the monthly payments until June, 1923, when he had
paid on the lot something over $1100. About that time
he concluded to sell his interest in the lot. It is apparent
from the testimony that Hammer had no business ability,
and he consulted defendant about the sale and told him he
did not know how to go about it. A few days later, Ham-
mer testified, defendant told him there was a claim against
the lot of about $400. This was not true, but Hammer
gave defendant a check for $350, which, together with $50
defendant owed Hammer, was sufficient to release the sup-
posed incumbrance, and defendant undertook, according to
Hammer's testimony, to clear the lot of the incumbrance
so that it could be sold. Defendant cashed the $350 check,
and, Hammer testified, kept the money. Defendant testified
he gave Hammer the money received on the check, and
was corroborated in this by a witness by the name of Mil-
ler, who was a carpenter living in Wisconsin but claimed
he was with the parties at the time the check was cashed
and the money turned over to Hammer. Later, according
to Hammer's testimony, defendant reported to him he was
negotiating for the sale of the lot with the Schaeffer Hous-
ing Association, real estate brokers, and to facilitate the
sale advised Hammer to assign his contract, and suggested
the assignment be made to D. W. Smith, who was a friend
of defendant and also an acquaintance of Hammer. This
assignment was made in the office of Hield & Co. on July 12,
1923, and it seems at about the same time Hammer and
wife executed a quit-claim deed either to the defendant or
to Smith. The evidence does not make clear which one

was the grantee in the quit-claim deed. Schaeffer investigated the title to the lot down to the date of the transaction and told defendant he was ready to close the deal. Defendant told Schaeffer that Hammer had hurriedly left this country for Germany but had assigned his contract and interest in the lot to Smith. Schaeffer said it made no difference to him whom he dealt with provided he got a good title to the property. Hammer had not left for Germany and was in Chicago, where he continued to remain. Defendant, Smith and Schaeffer went to the office of Hield & Co. and closed the transaction. Smith transferred the lot to Schaeffer's client, who paid by several checks the purchase price of $1650. Hield & Co. deducted what was due them on the lot and gave Smith their check for $701.82, which was the balance due the owner of the contract for the lot. Hammer was not present, and, it seems, never saw Smith or defendant till several months afterwards. He never received any of the money. Defendant appears to have left Chicago immediately after the transaction was closed and wrote Hammer postal cards from different places in Colorado and Missouri. The substance of the cards was that defendant would be back soon and would straighten all matters out. In one of the cards he said when he last saw Schaeffer he was mad and would not do anything; that when he came back he would see what he could do; that Schaeffer had no right to block the title, and that Miller would help Hammer until defendant returned. The plain purpose of the cards was to lead Hammer to believe defendant would return, close the sale of the lot and settle up with Hammer. He did not see Hammer until in January, 1924, after he was arrested under the charge for which he was indicted.

Hammer had an office in the basement of one of the Chicago University buildings. John Becker, who was employed by the university in Hammer's factory, testified that in January, 1924, he was in Hammer's office when Miller

and defendant came to the office. Defendant appeared to be excited, told Hammer he owed him money and would have paid it, but Hammer had him arrested and he would fight him in the highest courts.

Schaeffer testified to the closing of the deal for the lot, which he purchased for a client, in the office of Hield & Co. and the giving by Hield & Co. of a check to Smith for $701.82 drawn on the Greenebaum & Sons Bank. The check was introduced in evidence. It bears the endorsement of Smith, with the memorandum underneath the endorsement, "To be placed to the credit of Irwin Mindeman," who is a son of defendant. The check was endorsed by Smith to a national bank in Colorado. Defendant was present, with Smith, when the transaction was concluded but Hammer was not present.

Defendant testified in his own behalf that Hammer told him about his purchase of the lot and that he had made some paper giving a real estate man the exclusive right to sell it and had also given Schaeffer the exclusive right, but Hammer said a man named Turner was trying to collect from a man in Cicero and asked witness to settle the matter with Turner; that witness had nothing to do with transferring Hammer's interest in the lot to Smith; that witness was present at the time the property was transferred by Smith in Hield & Co.'s office; that witness had received no document from Hammer transferring the title to the lot to anybody and never received any money from its sale; that he did not act as agent for Hammer in the transaction and had no understanding with him that he was to receive the money. He further testified Hammer gave him a check for $350 to cash for Hammer; that in company with Hammer and Miller he cashed the check and gave the money to Hammer; that Hammer said he was in trouble with a woman. Witness testified he was present at the preliminary hearing and heard Hammer testify; that on that occasion Hammer testified he received the cash on the $350 check

318—11

from witness. He testified Irwin Mindeman is his son and lives in Colorado.

John E. Miller, a witness for defendant, testified he lived at Wawatosa, Wisconsin, is a carpenter and had known defendant about thirty-five years. He also knew Hammer and Smith. He testified he was with defendant and Hammer when the $350 check was cashed by defendant and that defendant gave the money to Hammer; that Hammer said he was in trouble with some woman and wanted to settle up but did not know how to do so; that witness was at the preliminary hearing, and Hammer there testified he received the money on the $350 check.

Andrew Mitchell testified for defendant that he is an attorney; that he was present at the preliminary hearing, and that Hammer testified there that he received the money on the $350 check. Mitchell also testified he knew friends and associates of defendant and had conversed with them about defendant's reputation for honesty and integrity; that in the community in which defendant resided witness knew his general reputation for honesty and integrity and that it was good.

In rebuttal Hammer testified he was not present with defendant when he cashed the $350 check; that he never had any trouble with a woman, and the check for $350 was given defendant to be used by him in connection with the lot; that he never told defendant he had any trouble with a woman, and never received the money for the $350 check.

James J. Fitzpatrick, on behalf of the People, testified he was, and had been, a police officer for twenty-four years; that he knew the general reputation of defendant in the community in which he resided in Chicago prior to the indictment; that his general reputation for honesty and sobriety was bad.

The decision of this case depends upon the credit to be given to the testimony of the witnesses. Hammer was a sculptor, raised in a foreign country and unacquainted with

the business of selling and transferring real estate. He applied to defendant to assist him. Hammer was a fit victim for a man who wanted to deceive him and profit by the deception. There was no incumbrance against the lot except possibly a few dollars for advertising, which was unpaid. The jury believed Hammer's story and disbelieved defendant's story. There is no question about the truth of Hammer's statement that he was beaten out of the money from the sale of his interest in the lot. Aside from the $350 check he gave defendant, Hammer was entitled to $700 for his interest in the lot after all claims had been paid. The check for that amount was given to Smith, to whom, at the suggestion of defendant that it would facilitate the sale, Hammer had transferred his interest in the lot. The check was endorsed by Smith, was cashed and the money placed to the credit of a son of defendant. Smith did not testify on the trial, and no explanation was made by defendant why Hammer never received the money. The conclusion is abundantly warranted that Smith and defendant were confederating for the purpose of swindling Hammer and securing the money for themselves. What defendant said, after he was arrested, to Hammer shows he admitted he had Hammer's money but was angered because he had been arrested, and declared he would fight it out in court. It is not surprising the jury believed Hammer and his witnesses and disbelieved defendant and his witnesses. In fact, it would be surprising if they had not done so. The testimony for defendant was in conflict with that for the People, and, as we have repeatedly held, it was the function of the jury to determine the truth of the controversy. (*People* v. *Stephens,* 297 Ill. 91.) In such a case a reviewing court will not reverse unless there is a reasonable doubt of defendant's guilt. The court will not substitute its judgment for that of the jury unless it seems clear the jury have made a mistake or that the verdict was the result of passion and prejudice. *People* v. *True,* 314 Ill. 89.

The judgment cannot be reversed on the ground that it is not supported by the evidence. It is probably true, some of the remarks of the State's attorney during his argument were improper, but they were not of a character which would probably influence the jury. Besides, the court sustained objections of defendant's counsel to the remarks and explicitly instructed the jury to disregard them, and later during the argument of defendant's counsel, when he referred to the objectionable remarks of the State's attorney, the court again told counsel and the jury he had sustained defendant's objections and the remarks of the State's attorney were not to be considered but were to be disregarded. That assignment of error is not sufficient to justify a reversal. *People v. Curran,* 286 Ill. 302; *People v. Strauch,* 240 id. 60.

No prejudicial error was committed, as alleged by defendant, in admitting or excluding testimony, and that assignment of error does not require further discussion.

One of the grounds of the motion for a new trial was newly discovered testimony, and defendant contends the court erred in ruling that the affidavit as to newly discovered testimony did not justify granting a new trial. Smith, to whom the check for $701 was given when the deal was closed for the transfer of the lot and to whom Hammer had previously assigned his contract, was not present at the trial. Defendant filed his own affidavit with his motion for a new trial, that he had "through accident learned of the whereabouts of Mr. D. W. Smith, who is an important witness in the trial of his case, and that he has until now had no opportunity to locate Mr. D. W. Smith." The affiant states if a new trial is granted Smith will attend the hearing and testify. Smith's affidavit stated Hammer assigned his interest in the lot to affiant; that the consideration for the assignment was money due affiant from Hammer and was made subject to indebtedness against the lot; that affiant received a check for $701, which he sent to Irwin Min-

deman to apply on a note affiant had given to Irwin for $2000, secured by mortgage on property in Pueblo, Colorado. Affiant states defendant never received any of the money; that he had no knowledge of the arrest and trial of defendant or he would have been present to testify. Affiant states if a new trial is granted he is ready and willing to testify as stated in his affidavit.

Applications for new trials on the ground of newly discovered testimony are not regarded with much favor by courts and will be closely scrutinized. To justify a new trial the newly discovered testimony must be conclusive and not merely cumulative. (*People* v. *LeMorte,* 289 Ill. 11.) The evidence must have been discovered since the trial and must be such as could not by the exercise of due diligence have been discovered before. (*People* v. *Dabney,* 315 Ill. 320; *People* v. *Williams,* 242 id. 197; *Henry* v. *People,* 198 id. 162.) It is apparent defendant knew, if Smith's affidavit is true, he would have been an important witness on the trial. He made no effort, so far as disclosed, to secure his attendance as a witness or to have the trial postponed until he could locate and secure Smith's presence at the trial. He chose to go to trial without Smith's presence, and after an adverse verdict claims he discovered for the first time Smith's importance as a witness. Furthermore, Smith's testimony as set out in his affidavit is cumulative and not conclusive. The circumstances of the transaction for which defendant was indicted, and the connection of Smith with it and with defendant, are such that the newly discovered testimony would by no means be conclusive. The court did not err in overruling the motion for a new trial.

We think the verdict was warranted by the evidence, and the judgment is affirmed.              *Judgment affirmed.*