(No. 22356.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* VERNON ROYALS, Plaintiff in Error.

*Opinion filed June 15, 1934.*

WILLIAM W. SMITH, and EDWARD M. KEATING, for plaintiff in error.

OTTO KERNER, Attorney General, THOMAS J. COURTNEY, State's Attorney, and J. J. NEIGER, (EDWARD E. WILSON, J. ALBERT WOLL, and HENRY E. SEYFARTH, of counsel,) for the People.

Mr. JUSTICE ORR delivered the opinion of the court:

Vernon Royals, a boy then seventeen years of age, was indicted, tried and convicted in 1932 in the criminal court of Cook county for the murder of Agnes Lavender in 1930 and sentenced to twenty-five years' imprisonment. By this writ of error he seeks a reversal of that judgment.

Mrs. Agnes Lavender, aged thirty-one years, of Forest Glen, was murdered some time after 6:30 P. M. on the night of February 17, 1930. Her body was found the next morning near a tree in a low place at the foot of the Chicago, Milwaukee and St. Paul railroad embankment, about a quarter of a mile northwest of the Forest Glen station, in Cook county. She had been shot in the head. Whether she had been criminally attacked is not disclosed by the record but foot-prints at different places along the embankment indicated that there had been a struggle. Her pocket-book was missing and was later found several hundred feet away in the forest preserve, with its contents— railroad ticket, powder puff, compact, beads and handker-

chief—strewn near by. No money was found in or near her purse. Her husband, Stanley Lavender, who worked in Chicago, had conversed with her over the telephone at about 5:30 P. M. on February 17 and she had agreed to meet him at the Chicago Union station at 7:40 that evening. She failed to keep the appointment, but evidently had gone for that purpose to the Milwaukee station at Forest Glen to board a train leaving there about 7:00 o'clock. On October 21, 1931, twenty months after the homicide, the police of Forest Glen took Vernon Royals (whom we will refer to as defendant) into custody. On October 22, the day following his arrest, defendant was questioned about the death of Mrs. Lavender. About 2:45 on the morning of the 23d the police secured a signed confession from him. In the afternoon of the next day he signed a second confession. On the 25th he signed another confession while in the office of the State's attorney. These documents were introduced in evidence by the People as exhibits 12, 13 and 14. Counsel who represented defendant at the time the bill of exceptions was prepared omitted to include these three exhibits. It is conceded that the three confessions contained admissions by defendant that he murdered Mrs. Lavender. He asserts, however, that the testimony of the officers involved in obtaining the confessions from him, or who were present at those times, discloses the contents of the confessions sufficiently for the purposes of this writ of error. After he was turned over to the sheriff defendant asserted his innocence and repudiated all the confessions, alleging that they had been extracted from him as a result of police brutality. The trial court heard testimony, out of the presence of the jury, to determine if the three confessions were voluntarily made and then admitted them in evidence. Defendant does not contend that the confessions, upon the testimony of the police officers, were not admissible as a matter of law. What he does insist upon is that the testimony shows con-

clusively that he was mistreated, and that the confessions are therefore entitled to little, if any, weight as evidence.

At the time of his arrest defendant was seventeen years old. At the time of the homicide he was two months past fifteen years old, weighed about one hundred pounds and was five feet six inches tall. The record does not divulge that he was a youth with a criminal record or possessed any criminal tendencies. He had moved with his father and mother and two brothers from St. Louis about eight months before the murder was committed and was then living at home with them—a distance of some eight miles from the scene of the crime. At that time he did not know the playmates he afterwards knew when his parents moved near the scene of the killing. The record is silent as to why he was arrested. There is no intimation in the record that prior to his arrest he was under suspicion of having killed Mrs. Lavender and we cannot indulge in any presumptions on that subject. The statement of facts contained in the brief of defendant undoubtedly contains a fair resume of the testimony as to how the confessions were obtained. The People concede this by stating in their brief that the statement of facts given in defendant's brief is substantially correct and complete and no additional statement of facts was made. It was also stipulated by the People "that on October 29, 1931, being the last occasion when defendant was brought to the office of the State's attorney, defendant stated that he had not shot Mrs. Lavender and his confession had been made by reason of having been beaten."

Defendant was arrested by an officer named Cilke about 5:30 P. M. on October 21, 1931, and taken to the Irving Park police station at 6:15 P. M. From that time until midnight this officer was with him continuously. On the 22d this same officer stayed with him continuously from 4:00 o'clock P. M. to midnight. On the evening of October 22 defendant was asked by this officer if he had killed

Mrs. Lavender, and received a denial. After taking defendant to the scene of the killing during the early morning hours of the 23d exhibit 12 was prepared, which defendant signed. James Doherty, who was with Cilke when defendant was arrested, said he asked defendant about the Lavender case, but he said he knew nothing about it. Thomas Harrison, police sergeant at the Irving Park station, was there when the officers arrived with defendant. He talked with him about the Lavender case at various times on the 21st and 22d. At the second interview, which lasted about thirty minutes, defendant said to the witness, according to the latter: "Sergeant, please do not talk to me about that case; I didn't do it." Harrison stated that as he was preparing to leave the station that night defendant said he wished to speak to him alone. He was accommodated, and then said to witness: "I have got to tell you I killed that woman; I got to get it off my mind; I have not slept since I committed that murder." The witness then went on to relate that defendant told the following story: That he was sitting in the Forest Glen station on the night of February 17, 1930, and saw a woman pass by; that when he went outside he asked her for a dime, telling her he had had nothing to eat all that day; that when she opened her purse he noticed that she had paper money; that he turned back, reached for his gun and told the woman to walk down the track; that the woman fought like a tiger, and after proceeding down the track a short distance she turned around, pulled his hair and scratched his neck until blood started to flow; that he then struck her on the lip; that this sort of stunned her and she ran down the railroad embankment; that he headed her off, and she came back up, then proceeded down to a switch-track and again ran down the embankment; that he then shot her, grabbed her purse and ran across the tracks.

About 3:45 P. M. on the 23d the witness Harrison, with other officers, took defendant to the office of an as-

sistant State's attorney. There exhibit 13 was prepared and signed by defendant. He had told different stories as to where he had procured the gun, all of them fictitious. He was told on the Sunday following the 23d that there were mistakes in his first statement and was asked to make a complete statement. Exhibit 14 was then prepared and signed by him. All of the police officers concerned in the arrest and examination of defendant testified at the trial to the effect that he had not been abused or mistreated prior to making the three confessions.

As to the confessions and his treatment by the police defendant testified that on February 17, 1930, he did not know where the right of way of the Chicago, Milwaukee and St. Paul was; that he did not leave his home at 10:00 or 11:00 o'clock in the morning of February 17, 1930, as recited in People's exhibit 14; that he was at the Lane school then; that he did not go to the Forest Glen forest preserve, reaching there about 1:30 P. M. on February 17, as recited in exhibit 14, nor look around the forest for a place to sleep, nor find a box-car in the Hill-Behan lumber yard, as set forth in that statement. His further testimony as abstracted follows: "At 3:30 on the 17th of February I was on my way on the Chicago avenue street car going home. I did not, as recited in the statement, lay down and try to get some sleep but failed because of the cold, nor did I get up and run around to circulate my blood, as recited in the statement, nor did I set around the depot warming myself by the fire, or smoke, as recited in the statement. I was not in the depot and did not see a woman come up on the platform or walk by the window or ask her if she could spare me a dime—that I wanted something to eat and had not anything to eat all day. I had fifty cents in my pocket at that time. I did not have a gun that day. I never in my life saw Mrs. Lavender, nor did I shoot her or try to attack her. I had never seen the Forest Glen station. I did not shoot Mrs. Lavender. All those various

things stated in my confession are untrue. I was struck by officer Harrison in the chest and back and face a few times. I did not tell that officer that I could not sleep since the 17th of February, 1930, nor did I cry on his breast and tell him I must get this off my chest. * * * The bruise on my chest was caused by handcuffs. Officer Harrison kicked me in the back. I did not tell him he was my friend. The first time any police officer talked to me about the Lavender case was on the 22d of October. I had had no sleep from the time I was arrested until that time. They gave me cigarettes, and I smoked about two and a half or three packages a day. I signed the statement of Friday, October 23, because the police said that if I did not they were going to keep me there longer. I went out to the place of the crime with the officers twice. The first time was about 8:00 P. M. Sergeants McDowell and Harrison took me, and they made me lay down where Mrs. Lavender was laying, shot in the head. I had not told them at that time that I had killed Mrs. Lavender. They made me get up from there and made me walk up the tracks, and I walked a long ways, and all the way they were beating me in the back and kicking me in the shins and saying, 'What did you do it for? What did you do it for?' and I said I did not do it. Then they took me about ten miles out in the country * * * and beat me. We got back to the station about 11:00 o'clock. Then everybody got out of the room but officer Doherty, and he locked the door and was in there beating me. He hit me in the chest, kicked me in the shins and hit me in the mouth, and hit me in the back lots of times. My lip and jaw were swollen. I did not see my mother or any member of the family Wednesday, Thursday, Friday or Sunday. When my father came he asked me if I killed the woman, and I told him I did not—that the cops forced me to say I did. This was the first I talked to any member of my family after they accused me of the murder. A lawyer named

Pickett came to see me and told me a friend had sent him and asked if it was all right for him to see my folks, and I told him yes. I never knew Pickett before that time. I saw Mr. Lavender. I was alone with the police then. He asked me if I killed Mrs. Lavender, and I said I did. The police told me if anyone came to see me I had better stick to my first statement. My family had not seen me yet. It was not true that I killed Mrs. Lavender. * * * On February 17, 1930, I had never been out north at the forest preserve and around those tracks. I did not know there was a golf course there at that time. I did not know there was such a place as the Hennepin road nor anything about a shack on the north side of the tracks. I made the statement that everything I had said in my statement was the truth and made of my own free will and not through any fear or threat, but it was not the truth. * * * Sergeant Harrison went with me over to Ditchburne's office, also Sergeant McDowell, officer Brandt and patrolmen Cilke and Doherty. They told me on the way over I had better change my statement a little about sleeping in the shack up in Edgebrook, and so I said that I slept in the box-car in the lumber yard; also about throwing the revolver in the river. I said that was the truth up in Ditchburne's office because the cops told me if I did not it would be warm for me when we got back to the station. They asked me how I came into possession of the revolver that I shot Mrs. Lavender with, and I told them I got it at Mrs. Miller's boarding house, which was not true. I never got a .32 revolver from Mrs. Miller or anybody in her house. The police took me over there, and Mrs. Miller came to the door and said she had never seen that pistol in her life before. Then I told them I got it somewhere else, and they took me over there. I told them I got it from Mrs. Miller because that was the first place I could think of. I told them about the other place because they told me I knew where I got the revolver and I had to tell

them  After they took me to Mrs. Miller's and the other place where I told them I had got the revolver they took me to the side of Merrick's Park, and they drove over there about 2:00 o'clock in the morning, and everybody got out of the car but Sergeant Harrison and myself, and there is where I got the scab on my chest from the handcuffs.  Nobody in Mr. Ditchburne's office struck me.  I came back to his office a second time just before I went to the county jail, and I told him I did not kill Mrs. Lavender.  I told him that the reason I signed the confession was because I was beaten up.  *  *  *  After we moved to our present address I had been down to forest preserve lots of times—nearly every day—with other boys, and we were in this little valley or ditch near where the murder was committed.  When we were playing out at the forest preserve the boys talked about the Lavender case a good many times.  They talked about who killed Mrs. Lavender, and I put my hand on my chest and said I did it.  That was just to try to be a big-shot in the bunch I was with.  I was laughing when I said it.  I played with those boys afterward, day after day.  I did not kill Mrs. Lavender and did not tell the truth when I said that.  It was just a joke then, it is not a joke now.  When the police took me out to the place of the crime it was dark and I was walking into the ditch where the woman was killed, and then they made me stand at the place where her body was found, with my finger pointed out, while the newspaper men took a snapshot of me, and then took me back to the station."  On cross-examination defendant said he was handcuffed to a chair after he was arrested and spent the night in this position.  The next night he was given a bed of boards near a teletype machine, the noise of which prevented him from sleeping.

Dr. Considine, assistant physician at the county jail, examined defendant on October 29 and found a scar on the abdomen, below the liver.  Dr. McNamara, jail phy-

sician, examined him on November 5 and found a bruise on the chest, with a scar about the size of a half dollar. There were two small scabs, one below each knee. The injuries, the doctor testified, might have occurred more than a week before. On rebuttal the People introduced the testimony of three doctors, Singer, Hoffman and Gerty, who examined defendant on October 29. These doctors observed some marks or bruises and saw an abrasion one-quarter of an inch in width and an inch long on the lower end of the breast bone and covered with a scab. They also saw two small abrasions on either knee-cap which were scabbed over, but testified that there were no bruises or other marks of violence on the face or shins. Defendant told these three doctors that the mark on his chest was caused by the officers pressing his handcuffed hands against his chest when they were ill-treating him.

The defense was an alibi. A doctor, a banker and a domestic, all reputable persons not related to defendant, together with members of the Royals family, all testified that defendant was at his home on the evening of February 17, 1930, but the jury evidently believed that the confessions were entitled to greater weight.

In support of his motion for a new trial on the ground of newly discovered evidence defendant presented five affidavits. Mrs. Lina Freed upon oath stated that on or about midnight of October 24, 1931, she alighted from a street car at the corner of Chicago and Central avenues, in Austin. An automobile containing police officers drove up to a news stand, and one of the officers asked the woman in charge if the boy in the automobile was Vernon Royals, who used to work for her. The newswoman replied that he was. The officer then told the woman that he had just confessed to the murder of a woman on the North Side. The car stood on the corner several minutes. The corner was well lighted. Affiant looked at the boy in the automobile. His hair was mussed, his eyes were red and he was crying.

Dry blood was on his face. Affiant read the news accounts of the trial and noticed that the police had testified they had not abused the boy. She then went to the office of the attorney for the boy and informed him of the facts stated, but was told that the evidence could not be used as the case had gone to the jury.

Otto Doerre stated in his affidavit that on February 17, 1930, shortly after 6:30 P. M., he, in the company of two other boys, went to the Forest Glen station of the railroad. They entered the station on the north side of the tracks, found it cold and went to the station on the south side of the tracks to see if it was warm. Finding no fire in the station affiant came out and met a lady on the platform, who he afterwards learned was Mrs. Lavender. She asked him about the next train, and he told her one would not arrive for quite a while. She then proceeded to walk up and down the platform. The three boys remained until about 7:30 and then left. They saw no one there but Mrs. Lavender. Affiant did not communicate this information to defendant or his counsel until after the trial.

Edward Hollinger in his affidavit stated he was with Doerre at the station and corroborated his statements.

Louise Scott's affidavit was in substance that at or about 5:00 P. M. on October 24, 1931, she visited the Irving Park police station in search of some stolen property. She saw defendant in custody of officer Harrison. When she started to talk to Harrison defendant spoke up and said Boland could tell her where the stolen property was. Thereupon Harrison struck defendant on the side hard enough to turn him around and told him to keep his mouth shut. She was told to come back about 7:00 o'clock, which she did. On this visit defendant was taken through the room. She observed that he had a badly swollen jaw and his eyes were badly bloodshot and appeared swollen. This information was not given to defendant, his counsel or family until after the trial.

Lawrence Scott in his affidavit stated that he visited the police station on October 25, 1931, to inquire about stolen property, and was told by the police that they had defendant out every night trying to clear up the Lavender murder and were all worn out.

Defendant also filed the usual affidavit in support of his motion.

Applications for new trials because of newly discovered testimony are not regarded with great favor by courts and are to be closely scrutinized. (*People* v. *Mindeman,* 318 Ill. 157.) The new testimony must be conclusive and not merely cumulative. (*People* v. *LeMorte,* 289 Ill. 11.) This court has held that newly discovered evidence must appear to be of such conclusive character that it will probably change the result on a new trial, it must have been discovered since the trial, and it must be of such character that it could not have been discovered prior to trial by the exercise of due diligence. The new evidence must also be material to the issue and must not be merely cumulative. (*People* v. *Buzan,* 351 Ill. 610, and cases cited therein.) If the new evidence is not cumulative in regard to the particular point involved, if its importance could not have been foreseen, if it strengthens the conviction of the court that justice has not been done in the particular case, a new trial will follow in order that there may be a further examination of the case. (*People* v. *Catell,* 298 Ill. 207; *Wilder* v. *Greenlee,* 49 id. 253; *Cairo and St. Louis Railroad Co.* v. *Schumacker,* 77 id. 583; *People* v. *Wright,* 287 id. 580.) Difficulty is often encountered in determining whether the new evidence is cumulative. It is generally found to be additional evidence of the same kind upon the same point. The rule stated above does not bar the granting of a new trial on the ground of newly discovered evidence if the new evidence relates to a material point contested on the trial, otherwise there would scarcely ever be a new trial granted on such ground. (*People* v. *Catell,*

*supra.*) In this case there were two bitterly contested matters, both very material to defendant's theory of defense. He interposed the defense of an alibi and also endeavored to nullify the confessions by attempting to show that they were obtained from him by police brutality. The affidavits presented in support of the motion for a new trial are germane to matters interposed by way of defense. It is impossible to forecast what kind of verdict a jury would render on a new trial after hearing this additional evidence. It is probable, but of course not a certainty, that a different verdict would be reached. In some of its aspects the new evidence may be said to be cumulative, but that does not bar it. The record of each particular case must control in matters of this kind and not a broad general rule, some of the terms of which are not susceptible of accurate definition. The People relied almost exclusively upon the confessions of defendant, and the corresponding testimony of the police officers, to secure defendant's conviction. In many respects this evidence appears highly unsatisfactory, as many important statements relied upon were clearly shown by other testimony to be untrue. A verdict of guilty is not conclusive of the sufficiency of the evidence, and it is the right and duty of this court, on review, to set the verdict aside if satisfied, from a consideration of all the evidence, that there is a reasonable doubt of defendant's guilt. (*People* v. *Kessler,* 333 Ill. 451; *People* v. *Abbate,* 349 id. 147; *People* v. *Elmore,* 318 id. 276.) Under the circumstances of this case as developed by the evidence and the two matters of defense, the trial court erred in not granting defendant a new trial on the ground of newly discovered evidence.

The determination of the above point renders unnecessary the consideration of other matters presented by defendant for review.

The judgment is reversed and the case remanded.

*Reversed and remanded.*