(No. 57660

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. CHARLES M. ALBANESE, Appellant.

*Opinion filed October 19, 1984.—Rehearing denied November 30, 1984.*

508

512

RYAN, C.J., and CLARK, J., specially concurring.
SIMON, J., concurring in part and dissenting in part.

Charles M. Schiedel, Deputy Defender, of the Office of the State Appellate Defender, of Springfield (Gary S. Rapaport, Assistant Defender, of counsel), for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Mark L. Rotert, Sally L. Dilgart and Jack Donatelli, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE UNDERWOOD delivered the opinion of the court:

In a jury trial in the circuit court of Lake County, defendant, Charles Albanese, was found guilty of the arsenic-poisoning murder of his mother-in-law, Marion Mueller. Pursuant to section 9—1(d) of the Criminal

Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(d)), the court conducted a separate sentencing hearing to determine whether a sentence of death should be imposed, and defendant was subsequently sentenced to death. The trial court stayed imposition of the sentence (87 Ill. 2d R. 609(a)) pending direct appeal to this court (Ill. Const. 1970, art. VI, sec. 4(b); Ill. Rev. Stat. 1981, ch. 38, par. 9—1(i); 87 Ill. 2d R. 603).

The evidence admitted in this case is substantially similar to that introduced in another case involving defendant (see *People v. Albanese* (1984), 102 Ill. 2d 54; hereinafter *Albanese I*), and will not be discussed in any detail. In *Albanese I,* defendant was convicted of murdering his father, M. J. Albanese, and his wife's grandmother, Mary Lambert, by arsenic poisoning; the attempted murder of his brother, Michael Albanese, by the same means; and the theft of property from the family business. He was sentenced to death on the murder charges, and we affirmed that judgment in *Albanese I.* The evidence in this case differs from that admitted there in that, in the guilt phase of this trial, no evidence related to the murder of defendant's father, the attempted murder of his brother, or the theft charges was admitted, and defendant did not testify at this phase, as he did in *Albanese I.* Also, evidence admitted here pertaining to defendant's scheme to have his cellmate, John Saltz, force Michael Albanese to sign a note confessing to all of the previously mentioned crimes and then murder Michael and his wife was not available at the time of the first trial.

Defendant argues that the evidence presented was insufficient to prove him guilty beyond a reasonable doubt, challenging the sufficiency of the State's evidence that he murdered Marion Mueller to obtain, through his wife, an inheritance that would ease the financial strain he was experiencing. In particular, he disputes the accuracy

of the State's evidence assessing his financial condition in 1980, urging the court to adopt calculations he offers here for the first time, which produce an increase in his cash assets and a decrease in expenses. However, as defendant acknowledges, the revised financial data do not alter the result that he overspent his income in 1980. Moreover, his revisions do not detract in any way from the State's evidence summarizing defendant's obligations and arrears in the critical months of July and August of 1980. As for defendant's more general argument that all of the circumstantial evidence submitted failed to prove his guilt beyond a reasonable doubt, we believe, as we stated in *Albanese I*, that the State has clearly established that Charles Albanese plotted and carried out this murder for financial gain. "A conviction can be sustained upon circumstantial evidence as well as upon direct, and to prove guilt beyond a reasonable doubt does not mean that the jury must disregard the inferences that flow normally from the evidence before it." *People v. Williams* (1968), 40 Ill. 2d 522, 526, *cert. denied* (1969), 393 U.S. 1123, 22 L. Ed. 2d 129, 89 S. Ct. 1004.

Defendant also contends that the State was erroneously permitted to introduce evidence of his financial problems and relies chiefly on *People v. Dorr* (1931), 346 Ill. 295, to support this proposition. In *Dorr*, the court stated that evidence of pecuniary embarrassment should have been excluded because: "A person's lack of money or even insolvency, *without other incriminating facts or circumstances,* does not justify the suspicion that, to improve his financial condition, he will commit one of the graver crimes of violence." (Emphasis added.) (346 Ill. 295, 302.) Defendant did not object at trial or in his post-trial motion to the admission of evidence concerning his strained finances, and thus any claim of error in this regard would normally be considered waived. However, even if there had been no waiver, we find that evidence

of defendant's financial problems was properly admitted under the rule in *Dorr* since there was a considerable amount of other incriminating evidence introduced to support the conclusion that defendant murdered Marion Mueller. That evidence includes defendant's initial denial to McHenry police that he had ever possessed arsenic; his conviction for the murder of Mary Lambert, whose death prior to Marion Mueller's enabled his wife to inherit valuable real estate jointly owned by the two victims; the promptness with which the victims' assets were used to pay defendant's debts; defendant's scheme whereby a former cellmate mailed letters, actually authored by defendant, but written as though from an anonymous third party, which implicated his brother and others in the crimes with which defendant had been charged; and his plot to have his brother murdered after he had been forced to sign a letter confessing to defendant's crimes.

Defendant further argues that evidence of other crimes committed by him, unrelated to the murder of Marion Mueller, was improperly admitted, thereby denying him a fair trial. He maintains that evidence of the following crimes was admitted in error: the attempted murder of his brother, Michael Albanese; theft of property from the family business; wilful withholding of child-support payments; and solicitation of the murder of his brother and sister-in-law. The first two arguments, relating to the admission of evidence of attempted murder and theft, are apparently based on the admission of two exculpatory notes he authored while in jail: a note, supposedly from an anonymous third party, circulated by his cellmate in McHenry County jail, Marty Nathan, and the "suicide" note his cellmate in Lake County jail, John Saltz, was to force defendant's brother to copy. The Nathan note states, in relevant part:

"*** The container Joe [Reichel] gave Charles had powder[ed] sugar with a little arsenic. Just enough to kill the animals. Mike almost took to[o] much by trying to make himself look like a victim. *** Mike set up the phoney [*sic*] theft."

The Saltz note contains the following relevant passage:

"*** I took arsenic myself to make Chuck look guilty [*sic*]. But I overdid it and now I'll never be the same. The sale of zinc and scrap was actually my idea. But I had him do it in a way that I could make mom believe Chuck did it alone. ***"

Since the trial court had granted defendant's motion *in limine* to exclude any evidence connected with his attempted murder of his brother by use of arsenic or the theft of company property, those facts necessary to fully decipher the meaning of these notes were not before the jury. In the absence of those explanatory facts, it seems to us the information contained in these notes simply does not implicate defendant in either an attempted murder or a theft. Nor is there in this record any evidence that defendant wilfully withheld child-support payments due his former wife; on the contrary, the evidence indicates that he was experiencing a cash shortage which made it impossible for him to comply with the terms of his divorce decree. Although section 1 of the Non-Support of Spouse and Children Act (Ill. Rev. Stat. 1979, ch. 40, par. 1101) makes it a misdemeanor to refuse to support one's children without lawful excuse, decisional law interpreting this statute indicates that inability to pay may provide the lawful excuse contemplated by this section. (See *People v. James* (1980), 89 Ill. App. 3d 157, 159.) Moreover, it is not common knowledge that it is a misdemeanor to neglect support obligations, and jurors were never so advised. Attorney Eugene Buchalter did testify that defendant was seized by the McHenry County sheriff pursuant to a body attachment issued by the court, but he stated that he requested

this order so that defendant would appear in court on a rule to show cause. Thus, the first three matters which defendant contends were improperly admitted simply do not constitute evidence that defendant committed other crimes.

It is clear, however, that evidence concerning defendant's solicitation of John Saltz to murder his brother and sister-in-law was before the jury since Saltz testified to this effect. Evidence of collateral crimes is inadmissible if it is relevant merely to establish the defendant's propensity to commit crimes. (*People v. Bartall* (1983), 98 Ill. 2d 294, 309; *People v. Lindgren* (1980), 79 Ill. 2d 129, 137.) The issue then is whether Saltz' testimony was admitted only to establish defendant's reputation as a bad person, deserving of punishment, or whether there was some other, legitimate purpose for its admission. We believe that the solicitation-of-murder evidence was properly before the jury because it represented the ultimate step in defendant's plan to fabricate exculpatory evidence and, as such, constituted evidence of defendant's consciousness of guilt. (See *United States v. Rajewski* (7th Cir. 1975), 526 F.2d 149, 158.) The scheme to have Saltz force Michael to sign a "suicide" note confessing to defendant's crimes would not have been complete if the two persons who, according to the note, were supposed to be committing suicide out of remorse for their misdeeds, remained alive.

Defendant urges that the trial court erred in permitting Rudolph Schaefer, an accountant who testified for the State as an expert witness, to state, over defendant's objection, his opinion that in July and August of 1980, defendant and Virginia Albanese were in "a very critical financial condition ***[,] [a]s evidenced by an acute shortage of cash." Defendant contends that such a statement constituted prejudicial error because it usurped the fact-finding function of the jury and maintains that our resolution of this same question in favor of the State in *Albanese I* is

not controlling here for several reasons. He argues that the expert testimony in this case is distinguishable because it analyzed the Albanese family finances for a shorter time period than in *Albanese I;* it was not balanced by an expert witness to challenge Schaefer's opinion as in *Albanese I*; and it had a greater potential to cause prejudicial error here, where the prosecution's case did not include evidence from *Albanese I* of defendant's convictions for the murder of his father and for the attempted murder of his brother. Although we agree with defendant that the presentation of the expert testimony in the two cases was not identical, the variances do not warrant departing from our holding in *Albanese I*. We there relied on *Miller v. Pillsbury Co.* (1965), 33 Ill. 2d 514, which states: "[T]he trend is to permit expert testimony in matters which are complicated and outside the knowledge or understanding of the average person, and even as to matters of common knowledge and understanding where difficult of comprehension and explanation. The jury still may accept or reject such testimony." 33 Ill. 2d 514, 516.

Defendant next contends that he was denied a fair trial because the prosecutor's closing argument was improper, and he cites five different comments, only one of which was objected to at trial, which he urges constitute reversible error. Any error related to the four comments to which no objections were made would normally be considered waived unless the comments were so inflammatory that defendant could not have received a fair trial or so flagrant as to threaten deterioration of the judicial process. (*People v. Owens* (1984), 102 Ill. 2d 88, 104.) We will first examine the four comments to which no objections were made.

Defendant contends that the prosecutor asserted facts not in evidence when he made the following statements:

"Who do the facts show had arsenic? The defendant. Only one other person does any fact [show] had arsenic

and that was Joe Reichel, the one who *** gave it to the defendant. Joe Reichel never met Mary Lambert or Marion Mueller. The only other one with arsenic that never met them and certainly he didn't get anything when they died, like the defendant got $70,000. Could it be contended that Joe Reichel snuck [sic] in to Mary Lambert's house and spread a little arsenic in something and snuck [sic] out? For no reason? No. And he's the only other one that had any arsenic."

In rebuttal, the prosecutor also stated:

"The only evidence you heard of anyone in possession of arsenic was the defendant, Charles Albanese."

Defendant relies upon *People v. Beier* (1963), 29 Ill. 2d 511, 517, for the proposition, which we do not question, that the prosecution may not argue assumptions and statements of fact not based upon any evidence. He maintains that, since at one point the prosecutor identified Joe Reichel as "the only other one that had any arsenic," the argument was improper under *Beier* because the evidence that Joe Reichel and defendant possessed arsenic did not eliminate the possibility that Virginia Albanese, Michael Albanese, or the victims themselves may also have had access to this substance. *Beier* only requires the prosecutor to refrain from commenting on facts not in evidence; here, the only evidence concerned with arsenic possession indicated that just two persons, Joe Reichel and defendant, had any. The prosecution was not required to balance its closing argument by mentioning that the State had failed to prove that no other persons possessed arsenic.

Defendant also contends that the prosecution twice misstated the evidence. He urges that one such misstatement occurred when the prosecutor commented that defendant was "in jail" for failure to pay child support. The testimony of Eugene Buchalter, attorney for defendant's former wife, established that he obtained a body attachment for defendant after he had failed to appear at two

hearings on a rule to show cause as to why he should not be held in contempt for failure to pay the child support and alimony required by court decree. Attorney Buchalter's testimony also indicated that the sheriff of McHenry County brought defendant into custody and that he was not released until his attorney contacted Mr. Buchalter and persuaded him to ask the court for an order directing the sheriff to do so. The record does not reveal the precise time period defendant was in the sheriff's custody, but it could reasonably have been inferred that defendant was in jail part of the time he was in custody. A prosecutor's statement based on a legitimate inference from the proof does not constitute improper argument. (*People v. Owens* (1984), 102 Ill. 2d 88, 105.) The same rule applies to defendant's contention that the prosecution misstated the facts when he argued that the only source for defendant's funds to pay the overdue child support and alimony was the death of either Marion Mueller or Mary Lambert. The $3,600 payment to defendant's previous wife was made by a check written on August 4, 1980, and post-dated August 15. Defendant cites the testimony of Virginia Albanese as conclusive evidence that the money for this payment came from a loan from a joint bank account she and her mother shared. The testimony of Terry Schetter, assistant cashier at Fox Lake State Bank, and other documentary evidence support the theory that the only source for a loan of this amount at this particular time would have been the close-out, on August 6, 1980, of the joint savings account shared by Mary Lambert and Marion Mueller. Since this loan, or gift, was not made until the date of Mary Lambert's death, the prosecutor could reasonably infer that no funds were available until her demise.

Defendant further asserts that the following rebuttal comments suggested to jurors that he was withholding incriminating evidence:

"He wants to make an issue out of the fact that Frank Lambert had the same symptoms as the deceased in this case. Maybe he knows something that we don't know. Maybe Frank Lambert somehow was at the defendant's house. Maybe Frank Lambert ate something that he shouldn't have at the defendant's house."

This argument, however, was a legitimate response to defense counsel's argument that the State's case against defendant failed to account for the illness of Marion Mueller's brother, Frank Lambert, who was hospitalized for symptoms similar to those suffered by his sister and mother. *People v. Dixon* (1982), 91 Ill. 2d 346, 350-51.

Next, defendant urges that certain of the prosecutor's rebuttal remarks blatantly appealed to the sympathies and fears of jurors. In concluding his rebuttal, the assistant State's Attorney remarked:

"Those two women that died, and the one in this matter, Marion Mueller, lived in a retirement village. They were old, for the most part, but they still had a life left to live, they had friends, they had loved ones, they had their shopping excursions and it's not up to anyone to say someone is to die or when that person is to die. It's not up to Charles Albanese to say there's no more life left for those people because he has financial problems, because he can't handle his problems."

These comments, which dwell upon the evil results of crime, are not improper. See *People v. Owens* (1984), 102 Ill. 2d 88, 105-06, and cases cited therein.

The foregoing comments, to which no trial objections were made, are within the bounds of proper closing argument and fall far short of meeting either of the standards cited in *Owens*. Accordingly, we turn to the comments to which defendant did object at trial, based on his contention that they amounted to a shifting of the burden of proof. The following exchange occurred during rebuttal:

"MR. DUFFY [assistant State's Attorney]: Counsel would also make an issue out of the fact that there are

some things the State cannot introduce in this case. You heard testimony of that over a week. There's no evidence of a first autopsy, he says. There's no protocol, there's no pathologists testifying here. But the defendant, as every defendant in a criminal case, through his counsel has subpoena power and don't for a minute think that if there's one piece of evidence the defendant didn't think would be helpful to him, you wouldn't get to see it. He can subpoena that pathologist if he likes. He can get —

MR. KELLY [defense counsel]: Objection. I think he's shifting the burden of proof by his comments.

MR. DUFFY: I'm not shifting, Judge. I'm replying to his argument.

THE COURT: But you can't shift the burden of proof.

MR. DUFFY: I agree. But I'm not.

THE COURT: Proceed.

MR. DUFFY: If those tracings helped him, he can subpoena anybody or any document that he wishes to testify here before you. The tracings aren't going to help. The tracings merely say the same thing that everybody else said. Mr. Principe, the Executive Director of the Northern Illinois Crime Lab [,] told you that he conducted the tests and he determined the presence of arsenic. The tracing was a documentation that signifies that particular fact."

We are of the opinion that the trial judge did not rule improperly. The comments here differ greatly from those in *People v. Weinstein* (1966), 35 Ill. 2d 467, 469-70, upon which defendant relies. In *Weinstein,* we reversed and remanded for a new trial because the prosecutor repeatedly stated that it was the burden of the defendant to present evidence creating a reasonable doubt of guilt. The prosecutor here did not state that defendant must provide the evidence that would create a reasonable doubt as to his guilt; rather, he pointed to defendant's failure to submit any evidence that would tend to refute the case against him. Such a comment is within the bounds of proper argument. See

*People v. Kubat* (1983), 94 Ill. 2d 437, 497; *People v. Blakes* (1976), 63 Ill. 2d 354, 359-60.

Defendant further argues that excluding jurors pursuant to *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, results in a jury that is prone to convict, violating defendant's sixth amendment right to an impartial jury made applicable to the States by the fourteenth amendment. Although he acknowledges that our court's decisions have consistently rejected this argument (see, *e.g., People v. Albanese* (1984), 102 Ill. 2d 54, 80; *People v. Davis* (1983), 95 Ill. 2d 1, 18, *cert. denied* (1983), 464 U.S. 1001, 78 L. Ed. 2d 697, 104 S. Ct. 507; *People v. Tiller* (1982), 94 Ill. 2d 303, 322, *cert. denied* (1983), 461 U.S. 944, 77 L. Ed. 2d 1302, 103 S. Ct. 2121-22; *People v. Lewis* (1981), 88 Ill. 2d 129, 147, *cert. denied* (1982), 456 U.S. 1011, 73 L. Ed. 2d 1308, 102 S. Ct. 2307), defendant urges reversal of his conviction on this basis. We see no need for further discussion of this question.

In related arguments, defendant contends that the very process of *Witherspoon* questioning leads to a more conviction-prone jury because it enables prosecutors to peremptorily remove potential jurors who express tentative opposition to the death penalty in addition to excusing for cause those who unalterably oppose it, and because mere exposure to this type of questioning convinces jurors of defendant's guilt. We cannot accept these arguments without rejecting the very form of questioning which the Supreme Court approved in *Witherspoon*, a decision recently reaffirmed in *Maggio v. Williams* (1983), 464 U.S. 46, 78 L. Ed. 2d 43, 104 S. Ct. 311, and *Adams v. Texas* (1980), 448 U.S. 38, 65 L. Ed. 2d 581, 100 S. Ct. 2521. Defendant also contends that jurors exposed to the *Witherspoon*-qualification process become convinced that our criminal justice system disapproves of opposition to the death penalty after seeing others in the venire excused for cause due to an inability to impose a death sentence, thus making this form

of punishment appear more appropriate than a prison sentence. He urges that since five prospective jurors and two prospective alternate jurors were excused for cause under *Witherspoon* and two more members of the venire were peremptorily removed, apparently on related grounds, the jurors selected to serve were so indoctrinated in the correctness of imposing the death penalty that they could not constitute the impartial jury the sixth amendment requires. This argument cannot succeed since, as noted above, the Supreme Court continues to approve *Witherspoon* questioning. Moreover, the argument is irrelevant here for two reasons. First the court, rather than the jury, made the sentencing decision in this case. Second, the individualized questioning concerning potential imposition of the death penalty and other matters was conducted outside the presence of all other members of the venire so that those selected as jurors did not have the opportunity to listen to juror dismissals for cause on *Witherspoon* grounds or related peremptory challenges.

Defendant also contends that even if the allegations of error previously examined were deemed harmless when considered individually, their cumulative effect was to deny him a fair trial. Having concluded that none of the points relied upon by defendant constituted error, logic dictates that there is no possibility for cumulative error.

Defendant further argues that he was denied effective assistance of counsel in violation of the sixth amendment due to certain acts or omissions of counsel. He urges that each of these alleged errors was of such magnitude as to satisfy both the standard this court has used to evaluate alleged deficiencies in representation (*People v. Greer* (1980), 79 Ill. 2d 103, 120-21 (actual incompetence of counsel entitles defendant to a new trial if the incompetence created such substantial prejudice that the trial result probably would have been different)) and the standard enunciated in *United States ex rel. Williams v. Twomey* (7th Cir. 1975),

510 F.2d 634, 641 (sixth amendment entitles defendants to representation that meets minimum standards of professional representation), upon which he relies.

The Supreme Court, in *Strickland v. Washington* (1984), 466 U.S. ___, 80 L. Ed. 2d 674, 104 S. Ct. 2052, recently adopted a standard which appears to combine elements of both *Greer* and *Twomey*. The court held that the constitutionally guaranteed assistance of counsel has not been provided if the defendant can prove that counsel's representation fell below an objective standard of reasonableness and that counsel's shortcomings were so serious as to "deprive the defendant of a fair trial, a trial whose result is reliable." (466 U.S. ___, ___, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064.) The court also indicated a defendant must establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (466 U.S. ___, ___, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068.) Emphasizing that the defendant must prove prejudice, the court stated: "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (466 U.S. ___, ___, 80 L. Ed. 2d 674, 692-93, 104 S. Ct. 2052, 2064.) The court also directed that "the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." 466 U.S. ___, ___, 80 L. Ed. 2d 674, 694, 104 S. Ct. 2052, 2065.

The court made the following cogent observations:

"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel

was unreasonable. *Cf. Engle v. Isaac* [(1982), 456 U.S. 107, 133-34, 71 L. Ed. 2d 783, 804, 102 S. Ct. 1558, 1575]. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' [See *Michel v. Louisiana* (1968), 350 U.S. 91, 101, 100 L. Ed. 83, 93, 76 S. Ct. 158, 164.] There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. See Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases [58 N.Y.U. L. Rev. 299, 343 (1983)].

The availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges. Criminal trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one of counsel's unsuccessful defense. Counsel's performance and even willingness to serve could be adversely affected. Intensive scrutiny of counsel and rigid requirements for acceptable assistance could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client." (466 U.S. ___, ___, 80 L. Ed. 2d 674, 694-95, 104 S. Ct. 2052, 2065-66.)

Although we do not foresee that application of the *Strickland* rule will produce results that vary significantly from those reached under *Greer*, we hereby adopt the Supreme Court rule for challenges to effectiveness of both retained and appointed counsel (see *People v. Royse* (1983), 99 Ill.

2d 163, 170) and reject the single-component test of *Two-mey*.

To assist lower courts, the Supreme Court also offered the following guidelines for applying its two-component standard: "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. \*\*\* If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." 466 U.S. ___, ___, 80 L. Ed. 2d 674, 699, 104 S. Ct. 2052, 2069-70.

In this case, defendant urges that his trial counsel erred in (1) eliciting, acquiescing in, and stipulating to evidence that tended to indicate arsenic-poisoning deaths are more often the result of homicide than of any other cause; (2) failing to object to evidence of defendant's finances and to references to other crimes in the confession and suicide notes; (3) failing to object to a statement in closing argument that defendant had been jailed for failure to pay child support; and (4) failing to examine the State's financial exhibits in sufficient detail to expose alleged flaws in testimony from the State's financial expert. Defendant submits that he probably would not have been convicted had his attorney not committed these alleged errors. We disagree, for our review of the record demonstrates that even assuming, *arguendo,* that all of the alleged errors constitute substandard representation, they would not have altered the result in this case. There is, therefore, no need to review the individual claims of inadequate representation to determine whether counsel acted within the range of reasonable professional assistance.

Next, defendant makes four related arguments pertaining to the State's decision to bring separate prosecutions for the murders of Mary Lambert and Marion Mueller. Defendant was convicted and sentenced to death for the

murders of Mary Lambert and M. J. Albanese in *Albanese I*. He urges reversal of his conviction in this case or, in the alternative, vacation of the death sentence, based on the first two arguments, which are grounded in sections 3—3(b) and 3—4(b)(1) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, pars. 3—3(b), 3—4(b)(1)).

Section 3—3 provides:

"(a) When the same conduct of a defendant may establish the commission of more than one offense, the defendant may be prosecuted for each such offense.

(b) If the several offenses are known to the proper prosecuting officer at the time of commencing the prosecution and are within the jurisdiction of a single court, they must be prosecuted in a single prosecution, except as provided in Subsection (c), if they are based on the same act.

(c) When 2 or more offenses are charged as required by Subsection (b), the court in the interest of justice may order that one or more of such charges shall be tried separately." (Ill. Rev. Stat. 1979, ch. 38, par. 3—3.)

Defendant argues that section 3—3(b) required the State to bring a single prosecution for the murders of Marion Mueller and Mary Lambert. To support this argument, defendant points to the similarities between the prosecutions at issue here and the facts in *Ciucci v. Illinois* (1958), 356 U.S. 571, 2 L. Ed. 2d 983, 78 S. Ct. 839, a decision which is generally credited with prompting the legislature to enact section 3—3 (*People v. Golson* (1965), 32 Ill. 2d 398, 411). In *Ciucci*, defendant shot and killed his wife and three children in the same incident and was charged in four separate indictments. He was tried three times: at the first two trials, involving the deaths of his wife and one child, he received prison sentences; at the third trial, for the murder of the second child, he received the death sentence. The Supreme Court held that the record indicated no due process violations, although it was argued that the successive prosecutions were fundamentally unfair, since

evidence of the entire occurrence was relevant in each of the three trials and since the prosecutor had announced to the press his plan of prosecuting the defendant until he obtained a death sentence. Defendant's attempt to align his murder prosecutions with the facts in *Ciucci* is of no avail, however, because, although *Ciucci* may have prompted the legislation upon which he relies, the committee comments to section 3—3 make it clear that this statute would not have required a single prosecution in the *Ciucci* case or in any other multiple-murder case:

"Section 3—3 is not intended to cover the situation in which several offenses—either repeated violations of the same statutory provision or violations of different provisions—arise from a series of acts which are closely related with respect to the offender's single purpose or plan. Many possible combinations of this sort are possible, but some of the common instances are the multiple-assault or multiple-murder situation, as in the Ciucci case ***." Ill. Ann. Stat., ch. 38, par. 3—3, Committee Comments, at 202 (Smith-Hurd 1972).

Defendant's reliance on section 3—4(b)(1) is similarly misplaced. He urges that he could have been convicted for the offense of murdering Marion Mueller in *Albanese I* since virtually the same evidence was used in the second prosecution as in the first, and so the subsequent prosecution was barred. Section 3—4(b)(1) provides:

"(b) A prosecution is barred if the defendant was formerly prosecuted for a different offense, or for the same offense based upon different facts, if such former prosecution:

(1) Resulted in either a conviction or an acquittal, and the subsequent prosecution is for an offense of which the defendant could have been convicted on the former prosecution; ***" (Ill. Rev. Stat. 1979, ch. 38, par. 3—4(b)(1).)

Again, the committee comments indicate just the opposite:

"Subsection 3—4(b). *** If the new offense charged is

one on which the defendant could have been convicted on the former prosecution, the second prosecution is barred. For example, a former conviction or acquittal of murder would bar a subsequent prosecution for manslaughter, assault with intent to murder (People v. Dugas, 310 Ill. 291, 141 N.E. 769 (1923)); or assault and battery, based on the same conduct with respect to the same victim; *but not on the same conduct with respect to a different victim (People v. Stephens, 297 Ill. 91, 130 N.E. 459 (1929)), even if the offenses charged are violations of the same statute, committed at the same time (see People v. Allen, 368 Ill. 368, 14 N.E.2d 397 (1937) for an analogous situation)."* (Emphasis added.) (Ill. Ann. Stat., ch. 38, par. 3—4, Committee Comments, at 217 (Smith-Hurd 1972).)

The committee's explicit adoption of the court's decisions in *Stephens* and *Allen* leaves no doubt that two prosecutions were permissible. Thus, defendant's two statutory arguments provide no basis for reversing his conviction or, alternatively, vacating the death sentence.

In his third argument pertaining to the separate prosecutions defendant contends that his death sentence, which was predicated on the section 9—1(b)(3) statutory aggravating factor of multiple-murder convictions, must be vacated because application of this factor on the facts of his case resulted in a death sentence that was imposed in an arbitrary and capricious manner. He correctly observes that if the trial in this case had concluded prior to the trial in *Albanese I*, instead of the reverse, he would not have been eligible for the death penalty under section 9—1(b)(3) in this case since there would have been only one murder conviction against him at that time. Having posited this alternative sequence of events, defendant contends that imposing the death penalty here is arbitrary and capricious in violation of the eighth and fourteenth amendments because he became eligible for it in this case only because *Albanese I* happened to progress more rapidly than this prosecution.

Although we agree with defendant that the order in

which the two cases were tried was dependent upon chance factors, this fact alone does not elevate his argument to one of constitutional magnitude. As this court noted in *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 541, *cert. denied* (1980), 445 U.S. 953, 63 L. Ed. 2d 788, 100 S. Ct. 1603, the meaning of the phrase "arbitrary and capricious" as used in the *Furman* decision was more fully explained by Justice Stewart in his plurality opinion in *Gregg v. Georgia* (1976), 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909, where he wrote:

> "[T]he concerns expressed in *Furman* that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance. As a general proposition these concerns are best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of the sentence and provided with standards to guide its use of the information." (428 U.S. 153, 195, 49 L. Ed. 2d 859, 887, 96 S. Ct. 2909, 2935.)

(See also *Barclay v. Florida* (1983), 463 U.S. 939, 950-51, 77 L. Ed. 1134, 1144, 103 S. Ct. 3418, 3424; *Proffitt v. Florida* (1976), 428 U.S. 242, 258, 49 L. Ed. 2d 913, 926, 96 S. Ct. 2960, 2969.) The decisions of the United States Supreme Court focus not on the procedures by which capital cases reach the trial court, which would be virtually impossible to review, but rather on the decision-making process of the sentencing body once the trial on guilt is concluded. Since our death penalty statute suitably restricts the discretion of the sentencing authority (*People v. Free* (1983), 94 Ill. 2d 378, 427, *cert. denied* (1983), 464 U.S. 865, 78 L. Ed. 2d 175, 104 S. Ct. 200), there is no basis for vacating defendant's sentence on the grounds that it was imposed in violation of the eighth amendment ban against cruel and unusual punishment.

Defendant's final argument concerning the separate prosecutions charges that prosecutors manipulated the dockets in the two cases and thus contributed to the alleged arbitrary and capricious nature of his death sentence here. Although we have already held that an eighth amendment arbitrary and capricious analysis should focus on the sentencing process rather than the manner in which a case goes to trial, we will briefly examine this argument since it essentially charges the prosecutors with professional impropriety. See 87 Ill. 2d Canon 9.

Defendant has appended to his briefs a newspaper article, which quotes a Lake County assistant State's Attorney responding to the question of why Lake County "was going to the trouble and expense of trying an already-convicted Albanese again" in the following manner:

> "If his conviction should be reversed or if the death penalty were to be vacated, we want to have a second conviction on him as a backup. So if it is reversed, he will not be a free man." Waukegan News-Sun, Oct. 11, 1982.

This statement, a response to an inquiry as to why more public funds should be spent on a second trial of a defendant already sentenced to death, was entirely proper and fails to establish any attempt to manipulate dockets so that *Albanese I* would go to trial first. The record in this case does reveal, however, that a Lake County grand jury returned an indictment against defendant for the murders of both Mary Lambert and Marion Mueller and that the charges against him for the death of the former were nol-prossed before trial of this case. Since defendant was indicted and convicted of murdering Mary Lambert in *Albanese I*, it may be inferred that at some point the State's Attorneys decided to include the Mary Lambert murder charge in *Albanese I* and to prosecute separately on the Marion Mueller charge. Sections 3—3(b) and 3—4(b)(1) permit separate prosecutions in multiple-murder cases, and venue was properly laid in Lake County for the murder of

Marion Mueller, who died in a hospital in Waukegan, Lake County, and, originally, in McHenry County for the murder of Mary Lambert, who died in McHenry Hospital. (See Ill. Rev. Stat. 1979, ch. 38, par. 1—6(c) ("If cause of death is inflicted in one county and death ensues in another county, the offender may be tried in either county").) Since there was no direct evidence as to the location at which either Marion Mueller or Mary Lambert ingested the arsenic that caused their deaths, a decision to prosecute the two women's deaths separately in the two counties where their deaths occurred, pursuant to section 1—6, is beyond reproach. We find no basis for vacating defendant's death sentence either on grounds that the prosecutors acted arbitrarily and capriciously in manipulating court dockets or on grounds of prosecutorial misconduct.

Defendant further argues that his death sentence must be vacated because the court considered defendant's conviction for the murder of M. J. Albanese, an offense that occurred after the murder of Marion Mueller, in determining his eligibility for the death sentence under the multiple-murder aggravating factor, section 9—1(b)(3). The court found that this aggravating factor was satisfied because defendant had previously been convicted of two murders in *Albanese I,* where the victims were Mary Lambert and M. J. Albanese. Marion Mueller died on August 18, 1980; Mary Lambert on August 6, 1980; and M. J. Albanese on May 16, 1981. Section 9—1(b)(3) provides that a defendant is eligible for the death sentence if he "has been convicted of murdering two or more individuals ***." Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(3).

It is defendant's contention that the statutory phrase "has been convicted" is ambiguous because it may refer to either prior offenses or to prior convictions and that, given this ambiguity, we should narrowly construe the language and hold that it applies only to prior offenses. We disagree with defendant's assumption that the statutory phrase

"has been convicted" is susceptible of more than one meaning. The statute speaks in terms of prior convictions, not prior offenses, leaving no room for judicial interpretation (*People v. Boykin* (1983), 94 Ill. 2d 138, 141). Considering that defendant's eligibility under section 9—1(b)(3) was also premised on his conviction for the murder of Mary Lambert, an offense that occurred prior to the murder of Marion Mueller and that this conviction, together with the murder conviction in the instant case, clearly satisfied section 9—1(b)(3), even under defendant's strained interpretation, we find that this argument borders on the frivolous.

Defendant next argues that this court should vacate his death sentence on the grounds that his decision to waive the jury at the. sentencing hearing was not knowingly and intelligently made since the record does not disclose whether he was informed that a jury's decision to impose the death penalty must be unanimous. The record does reflect that defendant signed a typewritten jury-waiver form, with handwritten changes indicating that it was adapted to apply to a sentencing proceeding under the death penalty statute, and also includes the following discussion of defendant's oral waiver:

"MR. KELLY [defense counsel]: Your Honor, I've discussed this matter with my client and we waive jury on the death penalty hearing, by his request. And I'd ask that this Court give me a week to prepare on that issue. Or at least to Friday. Could the Court hear it on Friday, possibly?

THE COURT: I don't want you to waive your right to a jury, which is a significant right, just for a matter of 24 hours or a day or something.

MR. KELLY: Oh, no, no, it's not for that reason at all. I've discussed this with my client at length and he feels that this jury basically knows all the facts of the other cases and that they would all be admitted, obviously, in a death penalty hearing, and we would just as

soon have the Court determine that issue. And it isn't my conception, it's his. Is that right, Mr. Albanese?

MR. ALBANESE: That's right.

THE COURT: The law provides that proceedings shall be conducted before the jury that determined the defendant's guilt, which we have here, or before a new jury impaneled for that purpose if there can be a showing for good cause if they should be discharged, or before the Court alone if the defendant waives a jury for the separate proceedings.

And you're telling me now, Mr. Albanese, you want to waive the jury?

MR. ALBANESE: Yes, your Honor.

THE COURT: Then that means that I will hear the evidence—

MR. ALBANESE: Yes.

THE COURT: And I will make that decision myself.

MR. ALBANESE: Yes, that's right.

THE COURT: You understand that after talking with your counsel?

MR. ALBANESE:, Yes. I do.

THE COURT: Because once I let this jury go home, then that's it and it will be up to me, you understand that?

MR. ALBANESE: Yes, I do.

THE COURT: Okay. Then at the defendant's request, the jury is waived. We'll call the jury in and discharge them.

Do you need more time to think about it, now?

MR. ALBANESE: No."

Defendant notes that in *People v. Brownell* (1980), 79 Ill. 2d 508, 536, this court declined to adopt a rule that would have expressly required our trial courts to inform all defendants of the unanimity requirement before accepting waivers of juries at capital sentencing hearings, and he urges that we now establish such a rule. We decline to do so and hold that the sixth amendment requires no precise formula for determining whether a waiver has been knowingly and intelligently made. Each

case will turn on its own facts and circumstances. (*People v. Taylor* (1984), 101 Ill. 2d 508, 520; *People v. Richardson* (1965), 32 Ill. 2d 497, 499.) The above-quoted discussion indicates that defendant conferred with his attorney at length before waiving the right and that the court questioned him closely about whether he wanted the court alone to determine the sentence. Moreover, less than six months before he executed the waiver in this case, defendant had been convicted of murder and sentenced to death by another jury in *Albanese I* on a related indictment and so became familiar with the jury's function at the sentencing hearing. Thus; we find that the oral and written waivers were effective.

Although we are satisfied that the facts and circumstances of this case demonstrate that defendant's waivers were knowingly and intelligently made, we suggest to trial judges that it would be preferable if, before accepting a jury waiver at a capital sentencing hearing, they would inform defendants that a sentencing jury would have to unanimously decide that the State has proved beyond a reasonable doubt the existence of a statutory aggravating factor and that there are not sufficient mitigating factors established to preclude the death sentence. We emphasize that, although this procedure is not constitutionally required, its implementation will eliminate post-trial and appellate argument as to the sufficiency of an otherwise valid waiver.

Defendant next argues that his death sentence should be vacated because various remarks of the trial judge indicated that he imposed the sentence because the court interpreted the statute to require a death sentence where it is determined that there are no mitigating factors sufficient to preclude its imposition. He contends that a sentence of death may be imposed only where, in addition to this statutorily required determination, the sentencing authority determines that death is the appropriate punish-

ment.

Defendant cites the plurality opinion in *Lockett v. Ohio* (1978), 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954, and *State v. Wood* (Utah 1982), 648 P.2d 71, 83, as support for the addition of an appropriateness standard. In *Lockett,* four justices held the Ohio death penalty statute invalid under the eighth and fourteenth amendments because it did not permit the sentencing authority to consider nonstatutory mitigating circumstances. The Illinois death penalty statute does not limit the sentencing authority to consideration of specified statutory factors (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(c)), thus satisfying the rule in *Lockett.*

Ironically, defendant's proposed two-tier sentencing determination would graft onto our statute a rule which would jeopardize its constitutionality. Throughout his briefs, defendant has argued strenuously that his death sentence should be vacated because it was imposed in an arbitrary and capricious manner in violation of the eighth amendment. If we were to approve his proposal to add a second "appropriateness" tier to the sentencing process, the vagueness resulting from the use of that term as a final test for determining whether defendants should receive death sentences would inject such an element of uncertainty into the proceedings that death sentences might well be imposed in the arbitrary and capricious fashion condemned as cruel and unusual punishment in *Furman v. Georgia* (1972), 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726.

Moreover, assuming that the court interpreted the death penalty statute as defendant contends, he did so correctly, for this court recently held, in *People v. Owens* (1984), 102 Ill. 2d 88, 113-14, that a court must impose the death sentence where it has found no mitigating factors sufficient to preclude the death penalty under the statutory directive of section 9—1(h) (Ill. Rev. Stat. 1983,

ch. 38, par. 9—1(h)).

Defendant next argues that the court erred in allowing into evidence at the sentencing hearing certain testimony of defendant's brother, Michael Albanese, which described how his family's life had been affected by knowledge of defendant's plot to have John Saltz murder Michael and his wife. The court conducted a unitary sentencing hearing; *i.e.*, after all the evidence had been submitted the court made both the finding under section 9—1(b)(3) that defendant was eligible for the death sentence due to his multiple-murder convictions and, pursuant to section 9—1(h), a finding that there were no mitigating factors sufficient to preclude imposition of the death sentence. Michael Albanese testified that, as a result of his knowledge of defendant's plot against his family, his home and office were under police surveillance; that he and his wife no longer left home in the evening without their children; that his children were not permitted to receive any telephone calls at school; and, because his mother is afraid, she has lived with his family from time to time.

Defendant correctly notes that in *People v. Davis* (1983), 97 Ill. 2d 1, 27-28, we vacated the death sentence due, in part, to the introduction of evidence regarding a victim's family during the first phase of a bifurcated sentencing hearing, in which the jury was to determine whether there was proof beyond a reasonable doubt of a statutory aggravating factor. We held that in the first, or eligibility, phase in which the ordinary rules of evidence apply, it is particularly important that a jury's determination be uninfluenced by passion or prejudice. However, this case is distinguishable from *Davis* in two respects: the evidence here did not concern the family of the victim in this case, Marion Mueller, and the sentencing authority here was the court, rather than a jury.

Defendant cites *People v. Owens* (1984), 102 Ill. 2d 88,

to the effect that evidence regarding nonstatutory aggravating factors may be admitted only after the court or a jury "is satisfied beyond a reasonable doubt that the State has proved a statutory aggravating factor." (102 Ill. 2d 88, 109.) The certified copies of defendant's prior murder convictions were the first items of evidence admitted at the sentencing hearing, and once these were before the judge he would have been justified in concluding that the section 9—1(b)(3) factor had been satisfied. Although he did not announce this conclusion before proceeding to hear the testimony at issue here, there can be no doubt that both parties were aware that defendant was eligible for the death sentence once that evidence had been admitted. We are satisfied that no error occurred here, but we think it would be preferable, although not constitutionally required, for the court to state its finding on defendant's eligibility for the death sentence under section 9—1(b) (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)) before proceeding to hear evidence in mitigation or nonstatutory evidence in aggravation under section 9—1(c) (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(c)). We note that defendant does not dispute the relevance of Michael Albanese's testimony as evidence of a nonstatutory aggravating factor admissible to assist the sentencing authority to determine whether the particular facts of this case warrant imposition of the death penalty once defendant's eligibility for that sentence has been determined. See *People v. Free* (1983), 94 Ill. 2d 378, 424-26, which holds that evidence pertaining to the victim's family is admissible for this purpose.

Defendant also advances various constitutional challenges to the death penalty statute. He argues that the death penalty statute violates the eighth and fourteenth amendments to the United States Constitution because, when considered in conjunction with sections 104—22 and 104—26(b) of the Code of Criminal Procedure of 1963 (Ill.

Rev. Stat. 1981, ch. 38, pars. 104—22, 104—26(b)), it results in an arbitrary and capricious imposition of the death penalty. Section 104—22 essentially provides that where a defendant's fitness to stand trial is at issue because of an inability to understand the proceedings or assist in his defense the court should determine whether special provisions or assistance would render the defendant fit to stand trial. Section 104—26(b) states that if a defendant was found fit to stand trial if given this special assistance, he cannot be sentenced to death. Because defendant interprets section 104—22 to include non-English-speaking individuals, and these two statutes, taken together, establish a class of persons who can never receive the death penalty, he urges that such a classification is without any rational basis. He contends that this allegedly irrational classification infects the death penalty statute, causing death sentences pronounced thereunder to be imposed in an arbitrary and capricious manner, constituting cruel and unusual punishment. We do not agree.

We discussed this question in some detail this term in *People v. Stewart* (1984), 104 Ill. 2d 463, and there held that the "provisions in article 104 clearly are not related to the needs of an accused who simply is non-English-speaking." (104 Ill. 2d 463, 501.) We explained that there was no indication that the unfitness with which article 104 was concerned was intended by the legislature to include an inability to speak or understand English. There is no need for further consideration of the issue here.

Defendant also contends that unless the statute requires the sentencing authority to specify in writing the aggravating factor or factors upon which the death sentence was based or, in the alternative, unless the statute requires the State to give pretrial notice of all aggravating evidence which it intends to introduce, it violates the eighth and fourteenth amendments. For the first alternative requirement, defendant relies upon *Barclay v. Flor-*

*ida* (1983), 463 U.S. 939, 77 L. Ed. 2d 1134, 103 S. Ct. 3418, in which the Supreme Court upheld the imposition of the death penalty under the United States Constitution, although the trial judge considered a nonstatutory aggravating factor in making the sentencing decision, a practice which Florida law prohibits. The Florida statute examined in *Barclay* requires the sentencing court to specify in writing the findings upon which a sentence of death is based. For the alternative proposition that our statute must furnish pretrial notice of all aggravating factors which the State intends to introduce, defendant relies upon *Zant v. Stephens* (1983), 462 U.S. 862, 77 L. Ed. 2d 235, 103 S. Ct. 2733. In *Zant*, the Supreme Court upheld the Georgia death penalty statute against a challenge that the sentencing authority's discretion was not sufficiently guided because the statute contains no guidelines for weighing aggravating and mitigating circumstances. The Georgia statute contains a requirement that limits evidence of aggravating circumstances to that made known to the defendant prior to trial. Although the Florida and Georgia statutes under review in *Barclay* and *Zant* include the two provisions upon which defendant bases his argument, in upholding the constitutionality of these statutes, the Supreme Court did not rely upon the particular provisions which defendant cites. Thus, we decline to depart from our own decisions which have upheld the constitutionality of our death penalty statute under the eighth and fourteenth amendments. See *People v. Free* (1983), 94 Ill. 2d 378, 427, *cert. denied* (1983), 464 U.S. 865, 78 L. Ed. 2d 175, 104 S. Ct. 200.

He further argues that we should reconsider decisions in which we have upheld the death penalty statute against the following alleged constitutional deficiencies: absence of sufficient information-gathering procedures to ensure adequate appellate review, absence of a requirement that the State prove beyond a reasonable doubt

that there are no mitigating factors sufficient to preclude the death sentence, and that the statute improperly vests the prosecutor with discretion whether to seek the death penalty. We have repeatedly declined to reconsider these arguments, and we continue to adhere to our previous decisions. See *People v. Gacy* (1984), 103 Ill. 2d 1, 103-05; *People v. Owens* (1984), 102 Ill. 2d 88, 114-15; *People v. Eddmonds* (1984), 101 Ill. 2d 44, 68-69; *People v. Garcia* (1983), 97 Ill. 2d 58, 80-82, and cases cited therein.

For the reasons stated, we affirm the judgment of the circuit court of Lake County. The clerk of this court is directed to enter an order fixing Tuesday, March 12, 1985, as the date on which the sentence of death entered in the circuit court is to be executed. A certified copy of this order shall be furnished by the clerk of this court to the Director of Corrections and to the wardens of the Illinois State Penitentiary at Menard and Joliet.

*Judgment affirmed.*

CHIEF JUSTICE RYAN, specially concurring:

My colleague, Justice Simon, in three capital cases, has emphasized that three members of this court, Justice Clark, Justice Goldenhersh and I, originally dissented from the holding of the majority in *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, which case upheld the constitutionality of our death penalty statute. Justice Simon made this point in *People v. Lewis* (1981), 88 Ill. 2d 129, 185 (Simon, J., dissenting), *People v. Silagy* (1984), 101 Ill. 2d 147, 185 (Simon, J., concurring in part and dissenting in part), and now in this case, *People v. Albanese* (Simon, J., concurring in part and dissenting in part). It is, apparently, my colleague's position that his vote against our death penalty statute, added to that of the three who dissented in *Cousins*, means that a majority of this court, as now constituted, is now of the opinion that our death penalty statute is not valid. In these

cases, my colleague has chided the three dissenters in *Cousins* for continuing to adhere to the holding of the majority in that case despite our "belief that the death penalty statute is unconstitutional."

My colleague errs when he asserts that I now believe that our death penalty statute is unconstitutional. That was my opinion at the time the opinion in *Cousins* was adopted. I stated in my dissent the reason for my belief. Four members of this court did not agree with my reasoning and held that the statute was constitutional. I must accept the fact that my opinion was wrong because four members of this court said it was wrong. In reality, the judicial process does not deal in abstract propositions of right and wrong. The decision of the majority in *Cousins* is binding not because of the concept that it is right or correct as a proposition of law, but because it is the final statement on that issue made by the highest judicial tribunal that has considered it. That is the nature of the appellate process. That is the manner in which cases and issues are decided. Simply because I dissent in a case does not mean that I must forever insist that I was right and the majority was wrong, or that "everyone was out of step except me."

The holding in *Cousins* is the law of this State unless it is reversed by a United States Supreme Court holding that our statute is unconstitutional. As noted in the quotation from Justice Traynor's article in Justice Clark's concurrence in this case, having noted my dissent, I must yield to the obligation that is upon me to live with the law as it has been stated. I therefore accept the law as stated in *Cousins*. It is therefore inaccurate to say that I now believe that our death penalty statute is unconstitutional. Since the decision in *Cousins*, I have authored several opinions upholding our death penalty statute, citing the decision of this court in *Cousins* as authority for so doing. Also, I have concurred in the holdings of several

opinions of my colleagues which have done likewise.

I am just as anxious as my colleague to have the Supreme Court pass on the constitutionality of our statute. I would have liked to have had our decision in *Cousins* reviewed by that court. Again, in *People v. Lewis*, we thoroughly discussed all of the issues that had been raised challenging the validity of our statute and, in a sense, invited the Supreme Court to review the case. To date, the Supreme Court has not seen fit to grant *certiorari* in any of the cases in which this court has upheld the imposition of the death penalty. I am sure that at some time in the future our statute will be reviewed, and a determination at that time will be made as to its validity.

There are 39 capital cases now pending in this court. We cannot wait until the Supreme Court finally passes on our statute before reviewing these cases. This would create an unmanageable backlog of death penalty cases in this court. We have reviewed 37 capital cases since the *Cousins* decision prior to this term of court. If we would have reviewed no capital cases after *Lewis*, the first case in which the imposition of the death penalty was affirmed, and if we would have waited for a decision of the Supreme Court in that case on the validity of the statute, we would now have a backlog of 75 capital cases. That figure would no doubt exceed 100 before *Lewis* finally works its way to the Supreme Court by way of *habeas corpus*.

Besides the judicial-administration consideration of the backlog problem, common decency requires that we review these cases as rapidly as possible. Of the 37 capital cases we have reviewed prior to this term of court, the penalty of death has been vacated in 20 of those cases. Those individuals upon whom the death penalty will not be imposed deserve to know their fate as soon as possible. It would be unconscionable to needlessly subject them

to the uncertainty of their fate until the Supreme Court finally passes on the constitutionality of our statute.

Until the Supreme Court does act, we must continue to apply the law as enacted by the legislature and upheld by a majority of this court. Those of us who dissented in *Cousins* cannot now do as my colleague urges in this case, go back and adopt our original assertion that the statute is invalid. As noted above, we have already reviewed 37 capital cases and upheld the death penalty in 17, applying the law as stated in *Cousins*. We cannot now flip-flop back to our prior contention that the statute is unconstitutional. The people of this State are entitled to more stability in the law than that.

Even if the three dissenters in *Cousins* were to join my colleague and declare our death penalty statute unconstitutional, that would not end the controversy. My colleague is philosophically opposed to the death penalty. If our legislature were to reenact a death penalty statute which could be subject to no possible constitutional challenge, I am sure my colleague would not vote to apply it. In the 37 capital cases we have so far reviewed, he has not voted to impose the death penalty in a single case in which he has participated. In the 17 cases in which the death penalty has been upheld, he has not voted in favor of the penalty in a single case in which he has participated. His dissent has not always been on constitutional grounds. In *People v. Free* (1983), 94 Ill. 2d 378, 434, *People v. Kubat* (1983), 94 Ill. 2d 437, 513, *People v. Davis* (1983), 95 Ill. 2d 1, 54, and *People v. Stewart* (1984), 101 Ill. 2d 470, 499, my colleague did not mention in his dissents any objection to the constitutionality of the statute, but argued that the penalty should be set aside on other grounds.

I therefore suggest that we get on with the business of this court and review the cases before us without needlessly cluttering up the opinions with dissents that do

nothing more than chide three members of this court for following the law as announced by the majority in *Cousins*. If my colleague wishes to adhere to his position that the statute is unconstitutional, he may do so by simply noting his dissent for the reasons stated in *Lewis* without continuing to remind three members of this court that they have at one time held a similar belief. This is all that his dissent in this case accomplishes.

When the Supreme Court passes on the validity of our statute, I will be very pleased, whatever the decision may be, because the issue will then be settled. I will naturally follow that holding as the final statement of the law on the question of the validity of our statute, as I have followed the holding of the majority in *Cousins*, which is now the final statement of the law on that question. However, if the Supreme Court upholds the validity of our statute, in view of his philosophical opposition to the death penalty, I wonder if my colleague will continue to insist that our statute is unconstitutional.

JUSTICE CLARK, specially concurring:

At this time I would like to reiterate my position concerning the constitutionality of the death penalty. I disagree with my colleague, Justice Simon, regarding the applicability of the legal doctrine of *stare decisis* when a constitutional issue is raised. I joined in Justice Ryan's dissent in *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 544, *cert. denied* (1980), 445 U.S. 953, 63 L. Ed. 2d 788, 100 S. Ct. 1603, the first case in which this court found our death penalty statute to be constitutional. Since dissenting in that case, there have been numerous cases where I have either participated in, or authored, opinions where the death penalty has been in issue. As I stated in my concurrence in *People v. Lewis* (1981), 88 Ill. 2d 129, 169-70,

"It is my considered opinion that, having once ex-

pressed my disagreement with an opinion of the court and then having followed such opinion in a case which was decided shortly after, it would be inconsistent to reverse my position simply because a new justice has joined this court. I agree with the view expressed by my distinguished colleague in his dissent that the doctrine of *stare decisis* does not mean that the law is immutable and rigid. On the contrary, I am a firm believer in the continuing evolution of our law and of the requirement that it change to meet changing circumstances. I think, however, that the circumstances which warrant changes in the law do not include changes in personnel. Rather, the circumstances I consider significant enough to bring about changes in the law are those which render an existing rule of law impracticable or unjust and which will bring about a sensible and just result. When those circumstances are present, I will vigorously vote to change the law.

I think, however, that a serious mistake would be made if, at this juncture, this court overruled *People ex rel. Carey v. Cousins* and struck down the death penalty statute. An opportunity to strike down the act was passed up two years ago. In the interim, several other opinions have approved the procedure whereby the prosecutor requests a death sentence hearing. Were we to declare the act void now, those opinions would stand for naught. They were the result of a great deal of deliberation by this court and represent our best efforts to offer lucid instruction on this exceedingly difficult issue. It would be grossly unfair to the citizens of the State and members of the General Assembly that, rather than declare the act unconstitutional when the first opportunity arose in *People ex rel. Carey v. Cousins*, we permitted prosecutors, the General Assembly, the judiciary, and criminal defendants, as well as the citizens of Illinois, to rely on our pronouncement that the act was constitutional. If we were to decide now, four years after passage of the act, and after so many persons sit on death row, that the act is unconstitutional, a great disservice to the stability of the law would be perpetrated by this

court. Such a result would indicate that this court does not decide issues based on the law, but based instead on who happens to be sitting on the court at a particular time."

In December of this year, our distinguished colleague, Justice Underwood, will be retiring from this court. With his leaving, a new justice will be elected to this court. We do not know how the newest member of this court will vote on this or any other issue. Again, I believe that a change in personnel should not be the impetus to change the law.

At this juncture, I feel compelled to again quote an appropriate statement made by Mr. Justice Traynor. In my concurrence in *Lewis* I stated:

"Finally, I agree with Mr. Justice Traynor's statement that once a judge has dissented, he is obligated to follow the law as pronounced. The respected jurist and scholar wrote:

'Paradoxically the well-reasoned dissent, aimed at winning the day in the future, enhances the present certainty of the majority opinion, now imbedded in the concrete of resistance to the published arguments that beat against it. For that very reason the thoughtful dissident does not find it easy to set forth his dissent.

Once he has done so he has had his day. He should yield to the obligation that is upon him to live with the law as it has been stated. He may thereafter properly note that he is concurring under compulsion, abiding the time when he may win over the majority, but he should regard dearly enough the stability of the law that governs all the courts in the state not to renew the rataplan of his dissent. When the trial court properly follows the declared law and is duly affirmed by the intermediate court, he should not vote for a hearing on the basis of his dissent. Conversely, should the trial court be reversed on the basis of his dissent, he should vote for a hearing. When the court has granted a hearing in a case

with muliple issues, including the ancient one, and there is a nucleus of dissenters on other issues, he should not cast his vote on the basis solely of his ancient dissent to achieve a reversal or affirmance that would not otherwise have materialized. To do so would only work mischief. The judge's responsibility to keep the law straight is not less when he is a dissenter.' Traynor, *Some Open Questions on the Work of State Appellate Courts*, 24 U. Chi. L. Rev. 211, 218-19 (1957)." 88 Ill. 2d 129, 170-71.

JUSTICE SIMON, concurring in part and dissenting in part:

I concur in the majority's judgment that the defendant's conviction for murder should be affirmed, but I dissent from the decision to impose the death penalty. For the reasons set forth in my separate opinions in *People v. Lewis* (1981), 88 Ill. 2d 129, 179 (Simon, J., dissenting), and in *People v. Silagy* (1984), 101 Ill. 2d 147, 184 (Simon, J., concurring in part and dissenting in part), I have concluded that the Illinois death penalty statute violates the United States and Illinois constitutions. In *Lewis* I expressed the view that the application of *stare decisis* in cases involving the Constitution and the death penalty is improper. In *Silagy* I examined the limits of *stare decisis* as it has been applied by the United States Supreme Court; that court's practice supports my position regarding the propriety of the doctrine's application in this context.

In addition to the violation of due process that, as I stated in *Silagy,* is inherent in the posture of the members of this court who continue to adhere to the majority decision in *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, despite their belief that the death penalty statute is unconstitutional, other constitutional difficulties result from this application of *stare decisis.* First, the application of the doctrine violates the supremacy clause of the

United States Constitution, which provides:

> "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, par. 2.

To enforce the Constitution is "imperative upon the state judges in their official *** capacities. *** They [are] not to decide merely according to the laws or constitution of the state, but according to the constitution, laws and treaties of the United States—'the supreme law of the land.' " (*Martin v. Hunter's Lessee* (1816), 14 U.S. (1 Wheat.) 304, 340-41, 4 L. Ed. 97, 106.) These principles have been settled since *Marbury v. Madison* (1803), 5 U.S. (1 Cranch) 137, 2 L. Ed. 60. See *United States v. Nixon* (1974), 418 U.S. 683, 41 L. Ed. 2d 1039, 94 S. Ct. 3090.

The supremacy clause establishes the primacy of the Federal Constitution, the provisions of which override all conflicting law, as well as doctrines having no constitutional basis or significance. *Stare decisis* is such a doctrine. At present, however, three members of this court, having expressed their belief that the death penalty statute of this State offends the Federal Constitution, refuse because of *stare decisis* to join me in invalidating that statute. They have thereby exalted *stare decisis* to a position above the Constitution, and allowed a doctrine having no constitutional basis or significance to override the affirmative constitutional guarantees of due process and protection against cruel and unusual punishment. The result is a clear violation of the supremacy clause.

Second, application of *stare decisis* in this context violates the State doctrine of constitutional supremacy. Sev-

eral opinions of this court establish this doctrine in State law. In *People ex rel. Miller v. Hotz* (1927), 327 Ill. 433, it was argued that awarding a writ of *mandamus* requiring the county clerk to issue an order appointing a day for the election of a new State's Attorney as required by the State Constitution was discretionary with the courts. This court said:

> "This is an amazing argument ***. The constitution is the supreme law, and every citizen is bound to obey it and every court is bound to enforce its provisions. It is a most extraordinary doctrine that the court has a discretion to enforce or not enforce a provision of the constitution according to its judgment as to its wisdom or whether the public good will be subserved by disregarding it." 327 Ill. 433, 437.

The position of the members of this court who refuse to invalidate the death penalty statute because of *stare decisis* is a decision not to enforce the separation-of-powers provision of the State Constitution on the ground that the public good in the form of stability and predictability in the law is served by disregarding that provision—precisely the kind of judgment this court forbade in *Hotz*. (See also *People v. Humphreys* (1933), 353 Ill. 340, 342; *Coalition For Political Honesty v. State Board of Elections* (1976), 65 Ill. 2d 453, 460.) These cases establish that Illinois' own supremacy doctrine forbids subordinating State constitutional provisions to a doctrine having no State constitutional dimension.

Moreover, this court has specifically acknowledged that the doctrine of *stare decisis* must yield to State constitutional considerations. In *Neff v. George* (1936), 364 Ill. 306, this court stated in reference to one of its prior opinions:

> "While in arriving at our decision no specific reference was made to [the] doctrine [of *stare decisis*], we were fully cognizant of it and of the fact that *it is not*

*universally applicable to all situations without exception.
The doctrine has more or less force, according to the
nature of the question decided.* \*\*\* Stability and uni-
formity of decisions conduce so much to the public wel-
fare and happiness, that when a rule of law has once
been settled, *contravening no statute or constitutional
principles,* it ought to be followed \*\*\*." (Emphasis
added.) *Neff v. George* (1936), 364 Ill. 306, 308-09.

Thus, *stare decisis* can apply only when State constitu-
tional provisions are not thereby contravened.

I therefore dissent from the decision to impose the
death penalty in this case for the reasons stated here as
well as those set forth in my separate opinions in *Lewis*
and *Silagy*.

## Addendum

The Chief Justice's specially concurring opinion was
delivered to me only moments before the opinions in this
case were made public. Because I was unable to respond
to his remarks in the customary manner, I am now filing
these additional observations.

The reasons I have set forth in this dissent for declar-
ing our current death penalty statute unconstitutional
have not previously been stated in any opinion filed in
this court. I regret that instead of addressing these new
constitutional arguments, the Chief Justice dismisses them
as "needlessly cluttering up" the opinion of the court
(104 Ill. 2d at 545 (Ryan, C.J., specially concurring)).

A judge of this court has both the right and the duty
to discuss new ideas on issues that are relevant to cases
before the court. A dissent is more than a statement of
disagreement; it provides an opportunity for the reexami-
nation of troublesome questions. Discreet silence may fos-
ter collegiality, but it does not enhance the resolution of
difficult problems. Only the continuing and vigorous airing
of conflicting viewpoints can assure the correct resolution

of such hard questions as the constitutionality of the present death penalty statute.

The primary function of a State supreme court is to declare what is correct as a matter of law, and to reverse prior errors in the interpretation and application of the law, including its own. Public confidence in our judicial system rests in large measure on the expectation that the appellate process will function in this manner. The Chief Justice states, however, that "[t]he decision of the majority in *Cousins* is binding *not because of the concept that it is right or correct as a proposition of law,* but because it is the final statement on that issue made by the highest judicial tribunal that has considered it." (Emphasis added.) 104 Ill. 2d at 543 (Ryan, C.J., specially concurring).

This statement implies that ours is a system of foot-race justice in which the first opinion entered prevails simply because it is first in time, and not necessarily because it is correct. While reliance on precedent is a useful and important device in our common law system, if a reviewing court fails to correct its own errors, but relies instead on a mechanical application of *stare decisis,* there can be no justice, for no other institution in our society is empowered to interpret and apply the Constitution to laws that are challenged.

*Cousins* is this court's final statement on this issue only as long as a majority of the court chooses to so regard it. It is unrealistic to regard such a complex issue as closed while academics and the bar are still developing new approaches to the issue. If this court erred in *Cousins,* it is our obligation to correct that error, especially because the death sentence is involved and the United States Supreme Court has thus far refused to review our death penalty statute.

The Chief Justice also states that it is no longer accurate to say that he believes the statute is unconstitu-

tional. He does not state, however, that he now believes it is constitutional, nor that if given the opportunity of deciding *Cousins* today, he would uphold the statute. Rather, he says that he accepts the fact that his dissent in *Cousins* was wrong "because four members of this court said it was wrong." (104 Ill. 2d at 543.) Apparently he feels compelled to uphold *Cousins*, not because he believes it was correct, but because he believes that the doctrine of *stare decisis* requires him to do so. In this classic confrontation between the doctrine of *stare decisis* and constitutional principles, however, the supremacy clause of the United States Constitution requires that constitutional principles prevail. That is what this dissent says.

It is an extraordinary view of *stare decisis* that requires a reviewing court to perpetuate a previously announced holding if that holding is wrong. *Stare decisis* does not require a judge to surrender his belief in a correct legal position for an incorrect one, particularly when the death sentence and essential constitutional principles are at stake. If a correct constitutional position were rendered forever incorrect merely because four judges once said it was, then our system of justice would not be one of laws, but one of men; not one of principle, but one of chance.

Relying upon a law review article published 26 years ago, the Chief Justice declares that I have already had my say on the constitutionality of our death penalty statute, and suggests that I should hereafter limit myself in dissenting to noting my position in *Lewis*. In response, I point out that Justice Traynor, the author of the frequently quoted law review article, never intended his views on the role of *stare decisis* to apply to death penalty cases. Eight years after his article was published, Justice Traynor adopted an earlier admonition by Judge Jerome Frank:

" 'In criminal actions, where life or liberty is at stake, courts should not adhere to precedents unjust to the accused. It is never too late to mend.' " *People v. Aranda* (1965), 63 Cal. 2d 518, 530, 407 P.2d 265, 272, 47 Cal. Rptr. 353, 360, quoting *United States v. Delli Paoli* (2d Cir. 1956), 229 F.2d 319, 323 (Frank, J., dissenting).

But it is too late to mend when a death sentence has been carried out. For that reason we should heed another of Judge Frank's admonitions, that "stare decisis should not govern in a case *** where a man's life is involved." *United States ex rel. Fong Foo v. Shaughnessy* (2d Cir. 1955), 234 F.2d 715, 718.

Since I have never proposed that this court postpone review of all death sentences until the United States Supreme Court rules on our death penalty statute, I do not understand the Chief Justice's judicial administrative backlog discussion. To defer the review of death penalty cases in this court is obviously impractical, and I see no reason to do so. If this court overrules *Cousins* or the Supreme Court invalidates our statute, the cases in which this court has upheld the death sentence will be remanded to the circuit courts for resentencing. That would hardly create an unmanageable problem. If, as Justice Goldenhersh has observed, the people of Illinois want an effective death penalty (*People v. Lewis* (1981), 88 Ill. 2d 129, 166 (Goldenhersh, J., concurring)), it is our duty to inform them of the defects in the particular statute passed by the General Assembly. We do a disservice to all if we blind ourselves to the unconstitutional features of our current statute, which may on a later day be struck down.

Finally, the Chief Justice attributes my disagreement with the majority to a "philosophical opposition" to the death penalty and a consequent reluctance on my part to enforce that sentence. However, I have never expressed

such a view. The Chief Justice is mistaken in his supposition that I would not uphold the death penalty even if the United States Supreme Court found no constitutional infirmity in the statute. When I took my oath of office, I swore to support the constitutions of the United States and the State of Illinois. I have no intention of departing from that oath.

Death penalty cases are difficult and painful for all of us who sit on this court. Each of us must act as he believes the constitution and his oath of office require.